259 N.J. Super. 156 (1992)
611 A.2d 1129
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MARK SETTE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 15, 1992.
Decided August 11, 1992.
*160 Before Judges KING, GRUCCIO and BROCHIN.
Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Wilfredo Caraballo, Public Defender of New Jersey, attorney; Stephen W. Kirsch, on the brief).
Arthur S. Safir, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Arthur S. Safir, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
Defendant killed an apartment roommate, stabbed another and tried to stab several neighbors. At trial he asserted the affirmative defenses of involuntary and pathological intoxication. He claimed that he was prevented from knowing the nature and quality of his conduct by a combination of cocaine, marijuana and Co-Tylenol, which he voluntarily ingested, and by a buildup of toxic pesticides in his body acquired during several years as a landscape worker. The State asserted that the homicidal attack and sequelae were prompted by revenge because of sexual rejection. Defendant was convicted of murder, attempted murder, several assaults, and weapon's offenses.
On appeal defendant's main thrust is that the judge erred in restricting his involuntary or pathological intoxication defenses to the consequences of pesticide exposure only. The judge instructed the jury that it could not consider any mental state induced by a combination of pesticide exposure with the voluntarily *161 consumed cocaine and other drugs as an affirmative defense to the crime. The judge did instruct the jury that voluntary intoxication was relevant to disputing the purposeful and knowing mental state required for murder.
Defendant also attacks several of the judge's evidentiary rulings and several of her jury instructions. We conclude that the appeal is without merit, except for error in the jury instruction on the attempted murder of Peter Johnson, and save for that conviction, we affirm.

I
These are the facts. In March 1988 defendant, then age 23, lived in the basement bedroom of a four-bedroom condominium in Plainfield. The three other bedrooms were occupied by Peter Johnson, Amy Cavalli, whose parents owned the condominium, and Rosemary Devaney. Johnson and defendant had been good friends for a long time and defendant had been friendly with Cavalli and her friend, Devaney, for several years.
At about 1 a.m. on March 21, 1988, in the condominium, defendant stabbed Devaney to death with a hunting knife and also stabbed Johnson. Defendant then left the building and entered a nearby condominium occupied by Michael Triano and Gina Columbus, whom defendant also tried to stab. Defendant claimed to have little or no recall of these events, a phenomena he and his expert witnesses attributed to several factors and events which occurred in the years and months leading up to the night of March 21.
Defendant had been employed since his high school graduation in the gardening and landscaping business. At these jobs defendant had been exposed to pesticides, herbicides and chemicals, including the bug killer, Sevon, although the level and concentration of exposure to these chemicals was disputed. He had often used cocaine on weekends. Defendant claimed to have experienced severe diarrhea, nausea, tingling in his fingertips and headaches with increased frequency for the two years *162 prior to March 1988, although defendant did not complain of these symptoms to friends or coworkers, nor did he seek any medical attention.
About one week before March 21, defendant had an argument with his long-standing female friend, Robin Nadel, after which he went to Florida for several days to think about their relationship and to relieve feelings of stress from his job. He returned on either Tuesday, March 15 or Wednesday, March 16 and promptly argued again with Nadel, who immediately left on her own trip to Florida. On Wednesday, Thursday and Friday nights (March 16-18) defendant, feeling upset from his disputes with Nadel, went to a bar called the "Goal Post" and drank heavily. On Thursday night, Kelly Fitzgerald, a female friend of Nadel's, went to a diner with defendant after leaving the "Goal Post" and returned with him to the condominium to spend the night. With the exception of the diner, they did the same thing on Friday night. Fitzgerald did not think defendant was depressed about Nadel nor did he complain about Nadel's absence to her.
On Saturday morning, March 19, defendant was having trouble with nasal congestion, prompting Fitzgerald to warn him to stop using cocaine. After Fitzgerald left the condominium on Saturday, defendant made arrangements with Kurt Terry to get some cocaine which Terry delivered to defendant at about 7 p.m. on Saturday night. Defendant snorted some cocaine as people in the house were preparing to go out on Saturday night to the "Hunka Bunka Ballroom," another local bar. His sister, Maria, recalled defendant asking in the car that night whether any of his friends would miss him if he died or whether they would attend his funeral. He drank heavily that night and awoke around noon Sunday with a hangover.
Sunday passed in a desultory fashion until evening, when defendant joined Kurt Terry and Terry's girlfriend, Tracy Martin, in snorting cocaine. Terry, Martin and another friend, Lawrence Guarino, saw that defendant was snorting uncharacteristically *163 large amounts of cocaine with unusual frequency, and warned him to slow down or stop. Between 8:30 and about 11:30 on Sunday evening, while defendant continued to ingest cocaine, Guarino and defendant played a war game titled "Axis and Allies" in the kitchen while the others were in the living room watching videotapes. Toward midnight several people, including defendant, smoked marijuana; defendant took several puffs from a marijuana cigarette and two "hits" from a bong or water pipe.
Defendant testified that he was despondent because he had not heard from Robin Nadel during the four days preceding Sunday night. Shortly after 7 p.m. he called Fitzgerald and told her he was "wired" from cocaine. To Fitzgerald, he did not seem depressed nor was he complaining about Nadel's absence. Kurt Terry and Tracy Martin recalled that defendant made several uncharacteristic remarks on Sunday night to the effect that "nothing matters." However, he also told Martin he did not care about Nadel, and told Guarino that there would be "trouble" when Nadel returned because defendant had stayed with Fitzgerald.
At about 11:30 p.m. on Sunday, March 20, 1988, Johnson went upstairs to sleep in his bedroom. By midnight, when Guarino left the condominium, Martin, Chris Smith and the other friends who had been there during the evening had already left. Erin Devaney, who had been there after returning from a family dinner with her sister Rosemary, left at about 12:50 a.m., or in the early morning of March 21. When Erin Devaney left, defendant was in his basement bedroom where he had gone at about 12:30 a.m., while Rosemary was in her second floor bedroom. Amy Cavalli had come home to the condominium at about 12:30 a.m. and had left at about 12:50 a.m. At that time there were lights on in Rosemary Devaney's bedroom.
Defendant remembered going downstairs to his room and thinking he wanted to die. To accomplish this he ingested the rest of his cocaine and swallowed most of the tablets in a Co-Tylenol *164 box on his dresser. Then, he said, everything went "crazy" and he could recall little except that he thought he was dead and nothing was real.[1]
Notwithstanding this memory lapse expressed at trial, defendant gave several statements to police when arrested on March 21 in which he recounted going up to Devaney's room and stabbing her when she opened the door, chasing her as Devaney fled into Cavalli's empty room, and then stabbing Johnson in the chest as Johnson tried to help the screaming Devaney. In his statement to police, defendant remembered Johnson fleeing the room after which defendant pursued Devaney down the stairs and slit her throat in the living room.
According to Johnson, he was awakened by Devaney's screams for help. He ran to Cavalli's room where he saw defendant holding a hunting knife which defendant had purchased *165 about three weeks earlier at a hunting convention. He told defendant to stop. Johnson put his arms on defendant's shoulders to get his attention but defendant stabbed Johnson in the chest. This wound measured three inches in width and seven to eight inches in depth and posed a substantial risk of death. Devaney was bleeding from the stomach area and yelled for Johnson to get help. She bled to death as the result of the many stab wounds inflicted by defendant. Johnson ran downstairs, unchained the front door and ran out to the yard, all the while hearing Devaney screaming for defendant not to kill her as she crashed down the stairs. Annie Latimore, a neighbor in the next condominium, was awakened by a woman's screams after which she saw defendant leaving the condominium at a normal pace carrying a bloody knife and saying "I have tried," several times.
Johnson ran screaming to a nearby condominium and was let in by Stephen Bodmer. Bodmer, his brother Richard, and their roommate Jeffrey Wenel, heard Johnson screaming hysterically that defendant had stabbed him and was chasing him. Johnson was bleeding and screaming for them to stop defendant. At about this time they heard sounds of a physical confrontation and a woman's screams coming from the condominium next to the Bodmers. Michael Triano, who lived next to the Bodmers, had been awakened by Johnson's calls for help and opened his door to see Johnson's blood all over his porch. Triano told Gina Columbus, his friend, to phone for the police.
As Columbus was phoning the police, defendant rushed in through Triano's open door covered in blood and began swinging his hunting knife at Triano. Defendant pushed Triano aside and ran for Columbus, who fled out the rear door as defendant chased her with the bloody knife raised over his head. Defendant chased Columbus around to the front of the buildings and down the street. Columbus ran into three people who brought her inside their house and called the police as defendant strode past the house still holding the knife.
*166 When the police arrived, Columbus got into their patrol car and pointed them in the direction defendant had taken. Two police cars converged on defendant, a short distance away. He was arrested, handcuffed and placed in a patrol car. The police then saw that defendant was kicking the rear window of the car, trying to break out of the car. When Sergeant Edwards of the Plainfield Police opened the patrol car door, defendant coiled his legs and landed a kick on Sergeant Edwards's nose. The officers then put ankle cuffs on defendant's legs and took him to the station.
At his "booking", defendant responded appropriately and accurately to questions about his biographical information and had no trouble walking without assistance to places he was directed toward. He was later read his rights and signed a waiver, after which he responded to police questioning by giving the details of Devaney's death as described. Several times during the questioning defendant claimed he could not recall some things and repeated that he felt he had died during the entire incident. At one point the police interviewer told defendant he thought he was lying about not being able to recall the stabbing, after which defendant admitted he had been wrong and described how he had stabbed and slashed Devaney and Johnson.
On the evening of Monday March 21, defendant was interviewed by a psychiatrist, Dr. Robert Latimer, who went to the county jail at the request of defendant's father. Dr. Latimer determined that defendant was delusional and acutely psychotic during the killing spree of the previous night and signed the first of two required "commitment" letters for defendant's transfer to a psychiatric hospital. On March 22 defendant was taken to an emergency room for sutures to a wound on his left leg and was examined there by the staff psychiatrist, Dr. Chong Jaw, who found him dazed but fully cognizant of what had happened and of the charges of murder lodged against him. However, since defendant claimed to be contemplating suicide, Dr. Jaw concurred with the recommendation that defendant be *167 sent to a psychiatric hospital, although he felt that defendant's problems were strictly related to substance abuse.
Defendant was transferred to Trenton Forensic Hospital where he was treated from March 22 to April 13, 1988 by Dr. Terrence Chamberlain, another psychiatrist. Dr. Chamberlain rendered no opinion at trial about defendant's mental capacity at the time of the killing and assaults, but diagnosed defendant's admission and discharge condition at Trenton Psychiatric as atypical psychosis secondary to substance abuse.
At trial Dr. Latimer testified that defendant did not know the nature and quality of his acts on March 21, 1988, as a result of psychosis induced by the various intoxicants. The State's psychiatrist, Dr. Daniel Greenfield, thought that defendant was not psychotic on March 21 and acted in a knowing, purposeful and goal-directed manner evincing awareness of both the nature and quality of his acts. There were also conflicting opinions offered at trial from several pharmacologists concerning the effect of his exposure to pesticides and chemicals during his work as a landscaper and their interaction with cocaine, marijuana and Co-Tylenol upon defendant's behavior and ability to act knowingly and with purpose on March 21. The defense experts said that defendant's conduct was a result of psychosis produced by the interaction of the drugs he took and his occupational exposure to toxic substances.

II
On June 6, 1988 defendant was indicted for murder and other charges arising from the events of March 21, 1988, as follows: first-degree capital murder of Rosemary Devaney, N.J.S.A. 2C:11-3a(1), (2); aggravated manslaughter of Devaney, N.J.S.A. 2C:11-4a; first-degree attempted murder of Peter Johnson, Michael Triano and Gina Columbus, N.J.S.A. 2C:5-1a(1), (2); aggravated assault of Johnson, Triano and Columbus, N.J.S.A. 2C:12-1b(1); unlawful possession of a weapon, a knife, N.J.S.A. 2C:39-5d; possession of the knife for unlawful purpose, *168 N.J.S.A. 2C:39-4d; third-degree aggravated assault (simple assault upon a police officer), N.J.S.A. 2C:12-1b(5); and, resisting arrest, N.J.S.A. 2C:29-2.
Defendant pled not guilty and his motion to suppress pretrial statements made to police was denied. A trial by jury was held before Judge Span between March 20 and April 19, 1989 (21 trial days), resulting in verdicts of guilty of first-degree murder of Devaney (Count One), attempted murder of Johnson (Count Three), aggravated assault on Triano (Count Six) and Columbus (Count Eight), possession of a weapon (Count Nine), possession of a weapon for unlawful purpose (Count Ten), aggravated assault of a police officer (Count 11) and resisting arrest (Count 12). Defendant was found not guilty of attempted murder of Triano (Count Five) and attempted murder of Columbus (Count Seven), while the lesser-included offenses of aggravated manslaughter of Devaney (Count Two) and aggravated assault of Johnson (Count Four) were dismissed.
A penalty-phase trial on capital punishment was held on April 20, 1989. The jury declined to impose the death penalty. On June 9, 1989 the judge sentenced defendant as follows: life, including 30 years without parole, on Count One; 20 years, including ten without parole, on Count Three, consecutive to the sentence on Count One; seven years each for Counts Six and Eight, each consecutive to the prior terms imposed on the other counts; four years each on Counts Ten and 11 concurrently; and, nine months on Count 12 concurrently. The aggregate sentence was 40 years without parole, minimum, to life plus 34 years, maximum.
Defendant raises these eight issues on appeal, five of which were not raised in the Law Division and which we examine under the "plain error" standard.
I. DID THE COURT ERR IN ITS INSTRUCTION CONCERNING PATHOLOGICAL INTOXICATION RESULTING FROM THE INTERACTION OF VOLUNTARILY INGESTED COCAINE, MARIJUANA AND CO-TYLENOL WITH INVOLUNTARILY INGESTED PESTICIDES? (Not Raised Below).

*169 II. WAS IT ERROR TO ADMIT EVIDENCE OF THE JURY VERDICT FROM A SIMILAR MASSACHUSETTS CASE?
III. WAS IT ERROR TO INFORM THE JURY OF DEFENDANT'S INCARCERATION ON THE CHARGES BEING TRIED?
IV. DID THE COURT ERR IN ITS INSTRUCTION CONCERNING INFERENCE OF INTENT FROM DEFENDANT'S USE OF A DEADLY WEAPON? (Not Raised Below).
V. DID THE COURT ERR IN INSTRUCTING THE JURY AS TO THE STATE OF MIND REQUIRED TO PROVE THE CHARGE OF ATTEMPTED MURDER OF JOHNSON? (Not Raised Below).
VI. DID THE COURT ERR IN ITS INSTRUCTION CONCERNING THE REQUISITE STATE OF MIND FOR CONVICTION OF POSSESSION OF A DEADLY WEAPON? (Not Raised Below).
VII. WAS DEFENDANT SUBJECTED TO INEFFECTIVE ASSISTANCE OF COUNSEL? (Not Raised Below).
VIII. WERE DEFENDANT'S SENTENCES EXCESSIVE OR UNJUSTIFIED?
We are satisfied that the claims of error are without merit except for V, the jury instruction on the attempted murder of Johnson. A reversal on that conviction is required. We do not reach the excessive sentence claim.

III
Defendant contends the trial judge erred in her instructions concerning involuntary pathological intoxication, an affirmative defense which would absolve defendant of criminal liability for his actions. The specific claim is that the judge failed to allow the jury to consider whether defendant's behavior was the result of an exaggerated "intoxication" caused by the combined impact of cocaine, marijuana, Co-Tylenol and the chemicals he was exposed to in his work as a landscaper, an intoxication on a level wholly out of line with his reasonable expectations based upon his experience as a cocaine drug user. We conclude that the judge did not err in the mechanics of rendering her instructions or in the substance of the instructions and we affirm on this point.
Defendant did not object to any instructions at trial and raises the issue here as plain error, that is, error in the jury charge prejudicially affecting his substantial rights and possessing *170 a clear capacity to bring about an unjust result. R. 2:10-2; State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970). In applying this standard, we must keep in mind that incorrect instructions of law "are poor candidates for rehabilitation under the harmless error theory." State v. Weeks, 107 N.J. 396, 410, 526 A.2d 1077 (1987). However, the fact that there was no objection here to the charge by an obviously competent defense counsel fortifies our conclusion that the instructions, as given, were cohesive, clear and understandable. Moreover, both counsels' final arguments clearly, specifically and forcefully focused the jury on the critical issues.
Conviction of murder requires proof that defendant acted purposely or knowingly. N.J.S.A. 2C:11-3a(1), (2). To act purposely requires a conscious objective to engage in conduct or to cause the result of conduct, while to act knowingly requires awareness of the nature of the conduct involved. N.J.S.A. 2C:2-2b(1), (2). When intoxication is claimed as a defense to the capacity to act purposely or knowingly, the intoxication must be of an extremely high level; it must have caused a "prostration of faculties" in the defendant. State v. Cameron, 104 N.J. 42, 54, 514 A.2d 1302 (1986); see State v. Bey, 112 N.J. 123, 144-145, 548 A.2d 887 (1988).
The defense of intoxication is divided between "voluntary" and "involuntary." Voluntary intoxication, sufficient to prevent formation of a purposeful or knowing state of mind, may be a bar to a conviction for murder, but cannot negate recklessness, the state of mind required for conviction of manslaughter. Cameron, supra, 104 N.J. at 53, 514 A.2d 1302; N.J.S.A. 2C:2-8b, 11-4. Involuntary intoxication is either not self-induced or is pathological and is a complete defense where the level of intoxication prevents the defendant from an awareness of the nature and quality of his acts or knowing that those acts are wrong. N.J.S.A. 2C:2-8d. The Criminal Code provides:
d. Intoxication which (1) is not self-induced or (2) is pathological is an affirmative defense if by reason of such intoxication the actor at the time of his *171 conduct did not know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Intoxication under this subsection must be proved by clear and convincing evidence.
e. Definitions. In this section unless a different meaning plainly is required:
(1) "Intoxication" means a disturbance of mental or physical capacities resulting from the introduction of substances into the body;
(2) "Self-induced intoxication" means intoxication caused by substances which the actor knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such circumstances as would afford a defense to a charge of crime;
(3) "Pathological intoxication" means intoxication grossly excessive in degree, given the amount of the intoxicant, to which the actor does not know he is susceptible. [N.J.S.A. 2C:2-8d and e].
Defendant contends that pathological intoxication was his "primary defense." As the definition makes clear, this requires proof by clear and convincing evidence: (1) that defendant's intoxication indeed was pathological in nature and (2) that the level of intoxication rose to the M'Naghten standard (unable to appreciate the nature and quality of his acts) customarily applied to the insanity defense found in N.J.S.A. 2C:4-1. Cannel, Criminal Code Annotated, Comment to N.J.S.A. 2C:2-8d, at 109 (1992). The affirmative defense of pathological intoxication was included in the Criminal Code and was derived from the Model Penal Code § 2.08(4) and (5). State v. Cameron, supra, 104 N.J. at 52, 514 A.2d 1302; Model Penal Code (U.L.A.) § 2.08 (1974).
When instructing the jury, the judge told them that the State had to prove beyond a reasonable doubt that defendant was not intoxicated to an extent which prevented him from acting purposely or knowingly; lack of such proof would result in the failure to establish an element, the requisite mental state, of the crime of murder. As to the affirmative defense of pathological intoxication, which would excuse defendant from criminal conduct, the judge advised the jury of defendant's burden to establish by clear and convincing proof that the intoxication was involuntary and pathological and that it prevented his awareness of the nature and quality of his acts.
*172 Defendant's appellate claim of error focuses upon the judge's distinction between substances defendant ingested with knowledge of their potentially intoxicating properties, alone or in combination, i.e., cocaine, marijuana and Co-Tylenol; and those substances about which there was evidence defendant was occupationally exposed without knowledge of their intoxicating properties, the pesticides. The judge charged the jury in pertinent part as follows:
Now, this defense cannot be established unless you are satisfied that this intoxication was caused involuntarily by the exposure to pesticides.
If Mark Sette was rendered temporarily insane because of his use of cocaine, marijuana, Co-Tylenol, or a combination of these drugs, which were ingested voluntarily, or willfully and exposed to pesticides, this defense is not available to him.
It is [in]sufficient[2] to find that pesticide exposure was a contributing factor to the defendant's mind becoming so altered that at the time of his actions, he was temporarily insane. It must be the sole cause of that intoxication, not in combination with cocaine or other drugs, for the defendant to be held not criminally responsible for any of his actions. If you should find that pesticide exposure was a factor leading to Mark Sette's becoming intoxicated, but that voluntary ingested drugs were the additional factors but for which Mark Sette would have been able to know the nature and quality of his actions, and that they were wrong, this defense has not been established.
* * * * * * * *
After careful consideration, comparison and evaluation of all of the evidence, material, and the issue of the defendant's involuntary intoxication allegedly causing temporary insanity, the assumed sanity of a defendant is not overcome until you determine that Mark Sette has sustained his burden of proving by clear and convincing evidence that at the time of the offenses, he was insane, due to exposure to pesticides, under the legal definition of insanity and therefore, is absolved of criminal responsibility or his conduct which would be otherwise criminal under the laws.
As we understand the instructions, as given in full on the point, the judge properly and carefully distinguished between the two types of intoxication defenses. If defendant could understand the nature and quality of his criminal acts, any involuntary intoxication defense would not apply since he *173 could not be "temporarily insane" under the M'Naghten standard as applicable to pathological and involuntary intoxication. If he met the M'Naghten standard of irresponsibility, defendant would have no criminal responsibility only if that state was induced solely by pesticide exposure which defendant had no reason to anticipate would induce a state of insanity. If a combination of pesticides and the illegal intoxicants which defendant voluntarily ingested brought on his inability to appreciate the nature and quality of his acts, defendant could only negate a knowing and purposeful murder but not establish a defense to manslaughter since voluntary intoxication could not defeat the reckless state of mind required for conviction of manslaughter. N.J.S.A. 2C:2-8(b).
No appellate cases in New Jersey discuss the affirmative defense of pathological intoxication. There is no New Jersey precedent regarding defendant's claim that his intoxication was pathological because unknown to him, an intoxicant, the pesticides, resulted in intoxication "grossly excessive in degree" by reacting with voluntarily ingested intoxicants. We conclude that the judge's instructions were sound and that, where a defendant, as here, voluntarily ingests large amounts of illegal intoxicants and intentionally overdoses on legal drugs, he cannot assert that he unexpectedly reacted violently to those drugs due to an unknown, underlying pathological condition which afflicted him.
Intoxication from drug use has the same legal consequences as intoxication from alcohol; voluntary drug use which prevents the formation of purposeful or knowing conduct negates the crime of murder, but not the crime of reckless manslaughter. State v. White, 27 N.J. 158, 165, 142 A.2d 65 (1958); State v. Roman, 168 N.J. Super. 344, 350, 403 A.2d 24 (App.Div. 1979). There is no legal distinction in this context between intoxication induced by alcohol and that induced by other chemical and organic toxins. However, since both involuntary and pathological intoxication are complete defenses to *174 otherwise illegal homicide, they are distinct defensive techniques with a different burden of proof than that which applies to voluntary intoxication.
Involuntary intoxication in the classic sense occurs when another person tricks or coerces a defendant into ingesting intoxicants which cause the defendant to lose control of his capacity to form the requisite mental state, while pathological intoxication is that "relatively rare phenomenon ... where a small amount of alcohol [or drug] may, because of an abnormal bodily condition of which the defendant is unaware, trigger an explosive reaction and a loss of self-control." 2 Wharton's Criminal Law § 110, at 77-80 (Charles E. Torcia ed., 14th ed. 1979). The American Law Institute states the proposition this way:
The second instance in which intoxication can afford an excuse is designed to provide a defense in a few, extremely rare cases in which an intoxicating substance is knowingly taken into the body and, because of a bodily abnormality, intoxication of an extreme and unanticipated degree results. Such cases involve a short, atypical reaction to alcohol. [Model Penal Code and Commentaries, Part I, § 2.08 at 365 (A.L.I. 1985)].
Our "Commentary" to the New Jersey Penal Code states:
Pathological intoxication is defined in § 2C:2-8e(3) and is intended to cover the situation where an intoxicating substance is knowingly taken into the body and due to bodily abnormality, extreme and unusual intoxication results. No New Jersey case was found. [Volume II: Commentary, New Jersey Penal Code 69 (1971) (citation omitted)].
Defendant tends to blur this distinction between involuntary and pathological intoxication. He claims that, without his knowledge, the pesticides to which he was exposed collected in his body until they combined with the voluntarily-ingested drugs in a surprisingly pathological way which temporarily rendered him mentally incapacitated. His real emphasis, however, is on pathological intoxication because it was not the involuntary exposure to chemicals in the pesticides which triggered his criminal conduct, but, in his view, the creation by those pesticides of a physical condition which caused a pathological "explosive reaction" from his voluntary illegal drug use.
*175 As noted, there are no appellate decisions in New Jersey regarding pathological intoxication. The Supreme Court recently considered the defense of involuntary intoxication in a case where the defendant claimed that he had a few glasses of wine, but that the level of intoxication which caused him to drive with a blood alcohol level of .20 was achieved due to a friend's prank. Unknown to the defendant, the friend had hidden ten to twelve ounces of vodka in what the defendant thought was fruit juice. State v. Hammond, 118 N.J. 306, 307-308, 571 A.2d 942 (1990). The Court held that the involuntary intoxication defense in the Criminal Code had no application to a charge of drunk driving because that charge arises under the Motor Vehicle Act and not the Code. Id. at 318, 571 A.2d 942. The Court focused on the fact that drunk driving is a strict liability offense and discussed involuntary intoxication only to remark that it can be a defense where some voluntary conduct is an element of the criminal charge. Id. at 313, 571 A.2d 942. Thus, Hammond does not assist us in the evaluation of defendant's claim here concerning pathological intoxication.
The only reported New Jersey decision dealing with pathological intoxication concerned a simple assault charge for which the defendant claimed she lacked the ability to act knowingly or purposely due to a combination of prescription fiorinal, a mild sedative, and a Black Russian cocktail. State v. Holzman, 176 N.J. Super. 590, 592, 424 A.2d 454 (Law Div. 1980). Judge Bachman ruled that defendant failed to establish involuntary intoxication since her intoxication was self-induced; the "reasonable person ought to know that mixing medicine and alcohol can produce irrational behavior." Id. at 593, 424 A.2d 454.
As to pathological intoxication, the Holzman court found no evidence that the defendant met the definition of this defense, which it defined as "a severe intoxication which the actor had no reason to expect which happened because of some underlying organic condition." Id. at 594, 424 A.2d 454. The judge in Holzman did not further discuss what "underlying organic condition" was required to establish the defense. The judge did *176 refer to a medical text for the definition of "pathological" as "diseased or due to a disease." Ibid. The judge did not address whether the organic condition sufficient to establish the defense can be triggered by self-induced illegal intoxicants. In considering this point, the experiences of courts of other jurisdictions provide some aid.
Some guidance in this regard is found in the federal circuits. In the only case we found in the federal courts directly discussing pathological intoxication, the court held that there was inadequate evidence to support a charge on the defense where the defendant knew of his propensity to blackout, act rashly and experience amnesia after drinking moderate amounts of alcohol. Kane v. United States, 399 F.2d 730, 737 (9th Cir.1968), cert. denied, 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969). Moreover, although medical testimony established that the defendant's schizophrenia combined with alcohol consumption to render him temporarily insane under the M'Naghten test, he could not establish an insanity defense where he was sane when sober but became insane only after he voluntarily began to drink. Id. at 735-736. The court essentially equated pathological and involuntary intoxication in the sense that either defense was foreclosed where the intoxication was in any part the result of voluntary consumption of a legal intoxicant which the defendant had reason to know could render him irrational.
Involuntary intoxication carries the same burden of proof as pathological intoxication and reflects the same philosophy: a defendant is relieved of criminal responsibility when his intoxication was not his fault. The involuntary intoxication defense has been rejected systematically where any part of the intoxication resulted from voluntary use of illegal drugs or of legal intoxicants for which the defendant had a known intolerance. This appears so regardless of whether the voluntary ingestion is combined with a pathological intolerance or an unwitting ingestion of another intoxicant. Thus, in a case where the defendant claimed that his mental disease, schizophrenia, combined *177 with voluntary consumption of drugs and alcohol rendered him temporarily insane and therefore not criminally responsible for his acts, the court found that the insanity defense was unavailable since it was in part the result of voluntary ingestion of illegal drugs and alcohol. United States v. Knott, 894 F.2d 1119, 1121 (9th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 197, 112 L.Ed.2d 158 (1990).
In Knott, the federal statute required that defendant establish by clear and convincing evidence that (1) he suffered from a serious mental disease or defect, and (2) that he did not appreciate the nature and quality of his acts. The court held that the defendant was not entitled to a defense instruction on the combined effects of voluntary intoxication and schizophrenia where his schizophrenia alone was not adequate to meet the second prong of the insanity defense: "[a] mental disease or defect must be beyond the control of the defendant if it is to vitiate his responsibility for the crime committed. Insanity that is in any part due to a defendant's voluntary intoxication is not beyond his control." Id. at 1122 (citations omitted).
Under federal law, the defendant may establish an insanity defense only if the insanity exists independently of any self-induced intoxication; it was appropriate to charge the jury that "[t]he voluntary use of drugs or alcohol also must be disregarded in determining whether the defendant could appreciate the nature and quality of his acts...." Id. at 1123. Accord United States v. Burnim, 576 F.2d 236, 237-238 (9th Cir.1978) (to establish insanity defense the insanity must be in no part the result of circumstances, such as consumption of alcohol, within the control of the defendant). See also United States v. F.D.L., 836 F.2d 1113, 1117-1118 (8th Cir.1988) (involuntary intoxication due to unknown presence of PCP in marijuana was not available to defendant since facts showed he knew nature and quality of acts; additionally, intoxication was not involuntary where any part resulted from voluntary ingestion of beer and marijuana by the minor defendant).
*178 Courts in several states also have rendered relevant decisions. The Colorado Supreme Court held that a defendant was entitled to rely on involuntary intoxication where he stabbed his hunting partner after long-term consumption of very high levels of "Hold" cough drops. People v. Low, 732 P.2d 622, 627-628 (Colo. 1987). The 120 cough tablets the defendant consumed in the 24 hours before the stabbing contained 1 gram of dextromethorphan hydrobromide which, in that quantity, could cause toxic psychosis. Where the defendant had no prior experience with such symptoms from this non-prescription cough drop and the maker's label gave no warning of this possibility, involuntary intoxication could be established. Low is an example of a "pure" involuntary intoxication defense where the claim is that an innocent consumption of cough drops, which the defendant had no reason to suspect would be intoxicating, destroyed his mental capacities. Low provides a clear contrast to the case before us, where the defendant concedes that his alleged "innocently-induced" physical condition brought on by pesticide exposure did not alone cause his loss of faculties, but only did so in combination with a very substantial dosage of illegal drugs  cocaine and marijuana  and a voluntarily-consumed intentional overdose of Co-Tylenol.
A California appellate court has held that, where a defendant had smoked marijuana without knowing that it contained PCP, he could not rely on the defense of involuntary intoxication since no one has a right to assume that marijuana will produce any particular predictable intoxicating effect. People v. Velez, 175 Cal. App.3d 785, 221 Cal. Rptr. 631 (1985). Only when intoxication is produced without fault of the accused, in contrast to knowingly using illegal drugs, can such a defense be available. The California appellate court summarized the cases:
In accordance with this view, courts have allowed the defense of involuntary intoxication based on the ingestion of an unlawful drug where the defendant reasonably believed he was consuming a lawful substance or where the unlawful drug was placed without defendant's knowledge in a lawful substance. (See People v. Scott, [(1983)] supra, 146 Cal. App.3d [823] at pp. 826-827, 194 Cal. Rptr. 633 [PCP surreptitiously placed in punch at family reunion-type *179 party]; People v. Carlo (1974), 46 A.D.2d 764, 361 N.Y.S.2d 168 [defendant took hallucinogenic pill in reasonable belief it was aspirin or lawful tranquilizer]; Commonwealth v. McAlister (1974), 365 Mass. 454, 313 N.E.2d 113, cert. denied, 419 U.S. 814 [1115], 95 S.Ct. 794, 42 L.Ed.2d 814 [coffee spiked with drug that produced reaction consistent with LSD]; People v. White (1970), 131 Ill. App.2d 652, 264 N.E.2d 228 [Drug put in defendant's beer without his knowledge]; People v. Penman (1915) 271 Ill. 82, 110 N.E. 894 [intoxicating pills reasonably believed to be breath perfume]). [Velez, supra, 221 Cal. Rptr. at 638-639.]
Accord Commonwealth v. Todaro, 301 Pa.Super. 1, 446 A.2d 1305, 1308 (1982) (if defendant drank alcohol without regard to the effects of its combination with medication he was taking, he cannot establish involuntary intoxication). A similar result was reached in Arizona where the court held that the defendant could not assert pathological intoxication as a defense where he "became pathologically intoxicated that morning only after he had voluntarily consumed significant quantities of alcohol." State v. Venegas, 137 Ariz. 171, 669 P.2d 604, 607 (1983); see also Commonwealth v. Henry, 524 Pa. 135, 569 A.2d 929, 935-936 (1990) (voluntary alcohol ingestion deprived defendant of defense of "alcoholic idiosyncratic intoxication.")
The cumulative thesis of these cases suggests that a court should resist allowing consideration of a pathological intoxication defense when intoxication results from a combination of voluntary ingestion of illegal intoxicants, or of legal intoxicants from which a person should reasonably expect an adverse reaction, or both, and a pathological hypersensitivity to those intoxicants. Here defendant's expert pharmacologist, Dr. VonHagen, testified that the combined effect of about 12 Co-Tylenol tablets and the amount of cocaine defendant claimed he ingested on Sunday, March 20, disturbed the level of norepinephrine in his blood and brain, resulting in rapid swings of behavior, possibly bizarre and paranoid behaviors. Dr. VonHagen described ingesting "at least ten [Co-Tylenol tablets] as a moderate to fairly large overdose." In fact, he said, within a reasonable medical certainty, that by themselves these drugs could cause hallucination and toxic psychosis. We conclude that if defendant was psychotic and delusional due in whole or *180 in part to cocaine and marijuana use and the Co-Tylenol overdose which he voluntarily ingested, he cannot legally assert the defense of involuntary or pathological intoxication.
Dr. Devinsky, an expert neurologist, testified for defendant that exposure to organophosphates in commonly used pesticides could have altered his level of cholinesterase, thereby aggravating the psychotic and delusional impact of the cocaine and Co-Tylenol mix. It was "extremely probable" in his opinion that defendant's killing of Devaney and stabbing other persons resulted from the combined effect of organophosphates, cocaine and Co-Tylenol. Even defendant's expert psychiatrist, Dr. Latimer, admitted that defendant's homicidal behavior resulted not from the atypical psychosis which Dr. Latimer diagnosed, but from the distortion of reality experienced by defendant as the result of the combination of toxins in his system, including the voluntarily-ingested Co-Tylenol and cocaine. The State's experts contended that, even assuming the levels of ingestion and exposure asserted by defendant, he was able at the time of the crimes to appreciate the nature and quality of his acts.
In no instance was there any real evidence or expert opinion that defendant's claimed exposure to organophosphates was the sole cause of his purported loss of the ability to appreciate the nature and quality of his acts. In our view the sparse treatment of pathologic intoxication in New Jersey, Hammond and Holzman, and the somewhat more expansive treatment elsewhere, for instance, Low, Velez, Venegas and Todaro, suggest that the trial judge in the case before us properly restricted the pathological intoxication defense to organophosphate exposure through pesticides alone. If defendant's system had been slowly poisoned by pesticides until he succumbed to a psychotic state under the intoxicating effects of organophosphate toxins alone, defendant could soundly rely on the pathological intoxication defense. Perhaps he could also rely on that defense if the organophosphates combined with a normal dose of Co-Tylenol or a moderate amount of the legal drug, alcohol. However, if defendant's system was compromised by pesticides *181 but he would not have lost contact with reality except as a result of his ingestion of large quantities of cocaine, as here, compounded by an intentional, substantial overdose of Co-Tylenol, he may not rely on an intoxication defense, either involuntary or pathological.
The only real evidence in this case on either involuntary or pathological herbicide intoxication demonstrated that any pathological frailty which afflicted defendant was insufficient by itself to inhibit his mental faculties but could only have prevented appreciation of his acts in combination with his voluntary ingestion of the illegal drugs, cocaine and marijuana, and the overdose of the legal drug, Co-Tylenol. The defendant had the burden to establish this affirmative defense, although the jury was permitted to consider and did consider any evidence of intoxication, whether induced by illegal intoxicants or unwitting exposure to pesticides, in determining whether he possessed the purposeful or knowing state of mind requisite for murder.
Voluntary intoxication might, in effect, establish a partial defense, leaving defendant exposed to a manslaughter conviction for reckless conduct. To absolve defendant of criminal behavior by the complete defense of pathological intoxication, he had the burden to show such intoxication, the source of which was not in any way voluntary, i.e., that it resulted solely from pesticide poisoning or from that in combination with moderate amounts of legal drugs or alcohol. We thus agree with the California appellate court in People v. Velez, supra, 175 Cal. App.3d at 792-93, 221 Cal. Rptr. at 636, which rejected the defendant's request for an involuntary intoxication instruction on the grounds that one who voluntary ingested an unlawful drug, there marijuana, could not claim his assaultive behavior resulted from PCP which he unknowingly and thus "involuntarily" ingested along with the marijuana. The California court held that, as a matter of policy, the law should not excuse a person from criminal responsibility if he acts in any part as the result of voluntarily consuming an illegal drug. Ibid. We *182 hold that Judge Span did not err in instructing the jury that, in order to excuse defendant's behavior altogether through the defense of pathological intoxication, the jury had to find that his intoxication resulted solely from his exposure to the organophosphate in pesticides, independent of ingestion of illegal drugs.
As part of his contentions dealing with pathological and involuntary intoxication, defendant also asserts that the form of the judge's instruction requiring him to prove pathological intoxication was constitutionally improper. He extracts this from the Third Circuit's holding in Humanik v. Beyer, 871 F.2d 432 (3d Cir.), cert. denied, 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), which concerned diminished capacity, and applies it to the defense of pathological intoxication. We think Humanik is an ill fit here and does not invalidate the judge's instructions.
In Humanik, the Third Circuit held that it was a violation of due process to require the defendant to prove the existence of a mental disease or defect (diminished capacity) by a preponderance of the evidence. Id. at 443. Due process required that the jury be permitted to consider any evidence, even if it does not establish a complete defense, when the evidence in support of that partial defensive material tended to disprove an element of the crime charged. Ibid; State v. Moore, 122 N.J. 420, 432-434, 585 A.2d 864 (1991). However, unlike diminished capacity, which concerns the mental state required for the crime charged, both the affirmative defense of pathological intoxication and that of insanity from which it borrows its quality of proof admit the elements of the crime but seek absolution or excuse from guilt; these defenses excuse admittedly objective criminal behavior instead of trying to defeat proof that a crime has been committed.
We do not offend due process by requiring a defendant to bear the burden of proving a justification or excuse defense so long as we also allow the jury to consider the same evidence as *183 it bears on the basic elements of the crime. Martin v. Ohio, 480 U.S. 228, 233-234, 107 S.Ct. 1098, 1101-1102, 94 L.Ed.2d 267, 274 (1987) (the State can require defendant to justify killing by self-defense if it also allows the jury to consider self-defense evidence to the extent it tends to negate other elements of the crime charged). If evidence of an excuse such as insanity is inadequate to meet a defendant's burden of proof to establish a complete defense, the jury must be permitted to also consider that evidence in deciding whether the State has proved the elements of the charge:
First there is the situation like that confronted in Patterson [v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)] and Martin [v. Ohio, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987)] in which the ultimate issues posed by one of the elements of the offense and by an "affirmative defense" are different, but nevertheless are such that subsidiary facts are relevant to both issues. This situation typically involves defenses such as insanity and self-defense which excuse or justify the commission of an offense. In such a situation, a state may place the burden of proof on the defendant with respect to the ultimate issue posed by the "affirmative defense." Nevertheless, the charge to the jury must make it clear that the jury can consider the defendant's evidence as it relates to the "element of the crime" issue, which the government has the burden of proof beyond a reasonable doubt, regardless of whether the jury believes the defendant's evidence more likely true than not true. [Humanik v. Beyer, supra, 871 F.2d at 440].
In the case before us, the judge began the trial by instructing the jury to presume defendant's innocence, cautioning that defendant had no burden to prove anything. At the close of the case, the jury was reminded of the State's burden to prove each and every element of each charge beyond a reasonable doubt. Since defendant had produced some evidence of intoxication, the State had to prove beyond a reasonable doubt that defendant was not so intoxicated that he was unable to act purposely or knowingly, the two mental states which voluntary intoxication may negate. The jury was so instructed. The judge reiterated that the jury must acquit on the charge of murder if defendant's intoxication created a reasonable doubt that defendant acted purposely or knowingly.
In instructing the jury on defendant's burden on the affirmative defense of pathological intoxication, the judge made it clear *184 that this burden only went to the absolute defense through which, if defendant did not know the nature and quality of his acts, he was excused from any criminal behavior. The judge specifically instructed the jury that if "after considering all the evidence you have a reasonable doubt based upon the defendant's intoxication that he could have acted purposely or knowingly, then you must acquit" on the murder charge. As to pathological and involuntary intoxication the judge said, "this defense cannot be established unless you are satisfied that this intoxication [referring to not knowing the nature and quality of acts] was caused involuntarily by the exposure to pesticides" and if the lack of appreciation of the nature and quality of his acts was the result in part of voluntary ingestion of cocaine and other drugs, "this defense is not available to him."
In our view, the court adequately segregated the evidence as it bore upon the parties' respective burdens of proof. Defendant asserts that these instructions prevented the jury from considering the combined intoxicating effects of pesticides and drugs when deciding whether the State had met its burden of proof on the murder charge. To the contrary, we read the instructions as requiring the jury to look to all the evidence before them on intoxication when deciding whether the State had established the knowing or purposeful conduct required for murder, but to look to pesticide exposure when deciding whether the involuntary or pathological intoxication defense excused defendant. The ruling of Humanik is not that affirmative defenses are unconstitutional where a defendant has the burden of proof, but only that the Constitution does not allow a court to confine evidence offered in support of an affirmative defense to that defense and instruct the jury that it is relevant to the defendant's burden of proof on the affirmative defenses alone. If the evidence also speaks to the elements of the State's case, such as a state of mind, the jury must be allowed to apply it to that issue as well. Here the judge placed the burden on defendant to prove that he was "temporarily insane" due to pathological or involuntary intoxication from pesticides, *185 but she also told the jury to apply any evidence of such intoxication to the question of whether the State had proven that defendant acted with the state of mind required for murder. Again, our conviction that the jury instructions were clear and understandable in this respect are enhanced not only by our own reading but by the absence of any objection by able counsel.
We thus reject both of defendant's attacks upon the judge's intoxication instructions. First, the court properly limited the defense of involuntary pathological intoxication to pesticides only since a defendant may not claim that criminal behavior should be wholly excused where it results in part from voluntary ingestion of large amounts of illegal intoxicants or an intentional overdose of legal drugs. Second, the judge properly explained the burdens of proof and did not foreclose the jury from considering the impact of toxins of any type or combination, whether cocaine, marijuana, Co-Tylenol or pesticides, on the issue of whether the State had proved that defendant acted with the mental state required for murder.

IV
Defendant next asserts that he was prejudiced by evidence of the guilty verdict in a Massachusetts murder prosecution which involved the defense of pathological intoxication from pesticide exposure. We find that the evidence was properly admitted under the circumstances of this case.
Dr. Devinsky testified as defendant's expert neurologist with regard to organophosphate exposure from pesticides and the possibility of involuntary intoxication leading to aggressive conduct. After a lengthy discussion of published studies in the field, he mentioned his own work in
the Garabedian case, in which I mentioned previously, in which a man committed an act of murder in Massachusetts, an organophosphate exposure, and this individual, similar to the current case, had no clear motivation for the crime. It was an extremely brutal trial.
*186 The State's objection to this reference was rejected, the judge preserving the State's right to explore the subject on cross-examination. Devinsky then reiterated that in the Massachusetts case "for no clear motivation that someone with no history of criminal or violent behavior previously, was exposed to chemicals in this case for a short period of time, organophosphate for two weeks, and committed a horrible murder."
Devinsky later described, again in his direct testimony, a television show "based upon the Garabedian case that I've made reference to" which concerned pesticide exposure and aggression and also opined that the evaluation of this defendant by defense expert witnesses was like that in the Garabedian case. On cross-examination Devinsky admitted that he had no direct knowledge about the pesticide exposure either of this defendant or of the defendant in the Garabedian case. Over a defense objection, the State was permitted to ask Devinsky if the jury in the Garabedian case had rejected the defense, to which Devinsky replied:
That's correct. I think mainly in that case, I had spoken to Dr. Baer who testified because a blood cholinesterase level was obtained in that case, turned out to be normal or within normal range, and on the polling of the Jurors after the case, the brief period of exposure and the fact that the blood tests was [sic] normal, weighed heavily on them against the verdict. However, as Dr. Baer testified in that case, and I believe absolutely correct, that the levels in the brain can be quite high when the levels in the blood are not.
The trial judge here later explained that she had only permitted the State to question Devinsky about the "Garabedian" result because the defense questioning of him attempted to use references to that case to validate the organophosphate exposure defense. Since the defense had brought the matter up, the judge permitted the State this latitude to avoid unfair potential prejudice. After a weekend recess, defendant moved for mistrial based upon the judge's allowing the jury to hear that a similar defense had been rejected in the Massachusetts case. After argument on the motion, the judge said:
Now, I believe that it was right to allow that question to be asked by the Prosecutor, given the impression that might or must have been, must have been *187 created in direct testimony. The Garabedian case was proof that someone had murdered because of exposure to organic phosphates.
Dr. Devinsky testified to a very strong similarity between the two cases on his direct testimony. It had to create the false impression that this defense had already been successfully pressed elsewhere. Although, normally a jury verdict in another case would have absolutely no relevance.
I believe it was not improper here given the manner in which the matter was raised by the Defense in his direct case.
Defendant seems to recognize that the State's question to Devinsky had certain probative value in this case, but contends the evidence of the outcome of the case was nonetheless immaterial and irrelevant. As defendant construes the evidence, Devinsky's direct testimony about Commonwealth v. Garabedian, 399 Mass. 304, 503 N.E.2d 1290 (1987), contained "[n]ot even a hint of the outcome of the trial." Defendant asserts that the only reason for admitting evidence of the jury's result was to inform the jury that their Massachusetts peers had rejected a defense being asserted before them, to the great prejudice of this defendant.
We see no merit to defendant's argument about materiality. Of course, it is improper for the State to ask questions which have absolutely no relevance. State v. Hutchins, 241 N.J. Super. 353, 359, 575 A.2d 35 (App.Div. 1990). Here defendant made the outcome of Garabedian material by using Devinsky's testimony to insert that case into defendant's trial as support for the idea that pesticide exposure can make an otherwise mild-mannered person commit murder. Defendant's expert brought up Garabedian in apparent support of his testimony that defendant was suffering from involuntary intoxication here and should be found not guilty, creating perhaps the false impression that such a result was reached in that case. In fact, while the factual and expert testimony in the Massachusetts case might have supported such a result, it was "clear that the jury rejected" this defense. Garabedian, supra, 399 Mass. at 312, 503 N.E.2d at 1296.
When a partial and possibly misleading account has been brought out by defendant's evidence, the State may properly *188 bring before the jury the complete information. State v. Knight, 63 N.J. 187, 193, 305 A.2d 793 (1973). In Knight, defense counsel elicited police testimony that an informant had told them drugs were sold out of a second floor apartment, and further established that the defendant did not live there; in this situation, it was not improper for the State to then elicit police testimony that the informant had also told them that the defendant would be leaving the apartment with heroin. Id. at 192-193, 305 A.2d 793.
The need to insure that partial evidence offered by a defendant does not unfairly mislead the jury was also the basis for the decision in State v. Downey, 237 N.J. Super. 4, 9, 16, 566 A.2d 822 (App.Div. 1989), certif. denied, 121 N.J. 627, 583 A.2d 323 (1990), where the State had produced evidence that the defendant had murdered her husband in part to recover thousands of dollars in life insurance. The defendant then produced testimony by her civil attorney that the attorney informed the defendant before the murder that he expected her to recover a settlement between $35,000 and $75,000 from an unrelated automobile accident case. Id. at 9-10, 566 A.2d 822. The State could then appropriately require the attorney to admit that the accident case eventually settled for only $4,000, both because the attorney's credibility was in issue and because the low settlement figure tended to undercut defendant's evidence regarding lack of pecuniary motive. Id. at 16, 566 A.2d 822.
Here there was a potential for the jury to understand Devinsky's testimony as an indication that a jury in Massachusetts had excused a like homicide based upon the similar exposure of the defendant to pesticides. The judge here was only ensuring a fair evaluation of the relevant evidence by allowing the State to remove that misperception. If the evidence tended to undercut defendant's main theory of defense, this resulted not from any impropriety by the judge or the State but solely due to the need to remove a possible false impression created by defendant.
*189 Fair correction of the erroneous implications of a defendant's evidence may sometimes require the expansion of the boundaries of admissible evidence which may be introduced by the State. The judge's ruling that fairness required expansion of the State's evidence here to include the Garabedian verdict is supported by a fair reading of Devinsky's testimony. We find no abuse of discretion in the judge's ruling in this highly discretionary area.

V
Defendant contends that the judge erred in defining the state of mind required for conviction of attempted murder and that his conviction for the attempted murder of Johnson under Count Three must be reversed. We agree and reverse on this count alone.
Defendant failed to object to the judge's charge either as originally given or when it was twice repeated. Defendant's challenge on appeal requires him to demonstrate plain error, i.e., error clearly capable of producing an unjust result or sufficient to raise a reasonable doubt whether it led the jury to reach a result it might not otherwise have reached. R. 2:10-2; State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971). Errors which go to the elements of the crime are particularly crucial to a jury's deliberations and make poor candidates for rehabilitation under the plain error theory. State v. Vick, 117 N.J. 288, 291, 566 A.2d 531 (1989); State v. Weeks, 107 N.J. 396, 410, 526 A.2d 1077 (1987).
In charging the jury on the state of mind required for conviction of attempted murder of Johnson, the judge told them that they must find that defendant, "when he stabbed Peter Johnson, did so purposely or knowingly, as I've defined those terms to you in Count 1." The judge repeated these alternative states of mind, purpose or knowledge, several times in her charge on the attempted murder of Johnson, as well as the attempted murder of Triano and Columbus. During its deliberations *190 the jury requested reinstruction on attempted murder and the court reiterated that guilt required a finding of purpose or knowledge. In responding to a second jury request during deliberations, the judge again defined the mental state element of attempted murder as acting purposely or knowingly.
This issue was recently considered and resolved by State v. Rhett, 127 N.J. 3, 601 A.2d 689 (1992). The Court there held that an attempted murder conviction must be reversed where the instructions allowed the jury to convict if the defendant acted purposely or knowingly. Id. at 4, 601 A.2d 689. The Court stated:
The erroneous charge is fatal to the conviction. Incorrect instructions of law are poor candidates for rehabilitation under a harmless-error analysis. We have consistently held that incorrect charges on substantive elements of a crime constitute reversible error. Because of the significant risk that the jury could have misunderstood the requisite level of intent necessary for a conviction on attempted murder, we must reverse that conviction and remand for a new trial. State v. Gilliam, 224 N.J. Super. 759, 541 A.2d 309 (App.Div. 1988). [Rhett, supra, 127 N.J. at 7-8, 601 A.2d 689 (citations omitted)].
The inchoate crime of attempted murder requires proof of the mental state set out in the definition of criminal attempt; the State must prove the defendant "[p]urposely engages in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be." N.J.S.A. 2C:5-1a(1). An attempt must be purposeful and no lesser mental state will suffice even if some other mental state could establish the underlying crime. Cannel, supra, Comment 3 to N.J.S.A. 2C:5-1, at 185. A conviction for attempt requires that the particular criminal result be one's conscious object, which is the distinguishing feature of a purposeful mental state. State v. McCoy, 116 N.J. 293, 304, 561 A.2d 582 (1989).
The State concedes that purpose is the required element of attempted murder, but argues the error was harmless since elsewhere the judge correctly required purposeful conduct for a conviction of attempted assault and since the evidence demonstrated that defendant's object was to harm Johnson. The test *191 to be applied in such circumstances is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law. State v. LaBrutto, 114 N.J. 187, 204, 553 A.2d 335 (1989). In this regard, great care is required where the error concerns an element of the offense:
To fail to define the offense attributed to the accused and the essential elements which constitute it, is to assume that jurors are educated in the law  an assumption which no one would undertake to justify. * * * Accordingly, we hold the view that a mandatory duty exists on the part of the trial judge to instruct the jury as to the fundamental principles of law which control the case. Among such principles is the definition of a crime, the commission of which is basic to the prosecution against the defendant. And the duty is not affected by the failure of a party to request that it be discharged. [State v. Federico, 103 N.J. 169, 176, 510 A.2d 1147 (1986) (quoting State v. Butler, 27 N.J. 560, 595, 143 A.2d 530 (1958))].
The Supreme Court's recent reversal under similar circumstances on State v. Rhett, supra, clearly undermines the State's harmless-error argument.
We conclude that the judge's two successive reiterations constituted plain error when she repeated the instruction that either purpose or knowledge would satisfy the State's burden on the charge of attempted murder. The repetition of the error clearly had the capacity to confirm for the jury that it could convict if defendant knew death could result from his conduct, that is, if he was aware that death would probably result. N.J.S.A. 2C:2-2b(2). In fact, defendant could only have been convicted if he acted purposely, i.e., harbored the conscious object of Johnson's death, N.J.S.A. 2C:2-2b(1), instead of mere awareness of its probability.
The State presses the point that an erroneous charge may not require reversal when considered in the context of the overall charge. State v. Zola, 112 N.J. 384, 401-402, 548 A.2d 1022 (1988) (charge improperly suggested defendant had burden to prove mental disease or defect, but balance of charge was fair and accurate); State v. Biegenwald, 106 N.J. 13, 42-43, 524 A.2d 130 (1987) (definition of reasonable doubt standing alone was inaccurate, but with entire charge did not have the *192 clear capacity to mislead the jury); State v. Russo, 243 N.J. Super. 383, 397-399, 579 A.2d 834 (1990). The key to finding harmless error in such cases is the isolated nature of the transgression and the fact that a correct definition of the law on the same charge is found elsewhere in the court's instructions. Here, by contrast, the State can only point to a correct definition of attempt in the context of lesser assault charges, but not a single correct exposition with regard to attempted murder. Nor was the error isolated. Instead, it was repeated for the jury's specific edification during deliberations, compounding rather than minimizing the problem.
The error is also harmless, contends the State, since defendant admitted his intent to stab Johnson and focused his defense on intoxication. In our view, this points out the significance of the error, since intoxication goes to defendant's mental state, the element of the crime which was the subject of the erroneous instructions. Given this critical aspect we cannot agree with the State that the erroneous instruction did not have the capacity to contribute to the verdict.

VI
We conclude that the balance of defendant's appellate contentions, points III, IV, VI and VII, are clearly without merit and require no discussion. R. 2:11-3(e)(2). In view of our reversal and remand for a new trial on Count Three, attempted murder of Peter Johnson, we also remand for overall resentencing because of the consecutive sentence imposed on Count Three. We do not reach defendant's excessive sentence claims. As we understand it, at the resentencing the sentence may be restructured, if necessary, as long as defendant is not "resentenced to a higher aggregate term than the original sentence." State v. Towey, 244 N.J. Super. 582, 597, 583 A.2d 352 (App.Div.), certif. denied, 122 N.J. 159, 584 A.2d 226 (1990). Of course, resentencing may await the outcome of any new trial or other disposition on Count Three.
*193 The conviction on Count Three is reversed and remanded for a new trial; the convictions on the remaining counts are affirmed.
NOTES
[1] We extract this recital of the facts from the appellant's own brief to document the use of alcohol and drugs before the events of March 21. In his appellate brief, defendant concedes his "massive ingestion of cocaine" on March 20 and 21 before the homicidal events. On the evening of March 16 he alternated drinking beer and tequila. The next night he drank what he described as "pretty much" beer and tequila, becoming intoxicated. The following night he went to the "Goal Post" again, the third night in a row, and "had quite a bit to drink." The next morning, Saturday, March 19, defendant and Terry shared some cocaine. He then went to a night club in Sayreville where he drank vodka and tonics and left early Sunday morning, March 20. He got so drunk that night that Amy Cavalli said it took him five full minutes to get the door to the condo open. He snorted cocaine that Sunday afternoon with Kurt Terry and this apparently continued into the evening. Tracy Martin described him snorting "massive lines of cocaine that night," much faster and in much larger quantities than she had ever seen him do. Defendant himself also admitted using more cocaine faster that night than he ever had done before. Terry warned him to slow down to avoid a heart attack. He was doing four to six lines every ten minutes. Defendant admitted that he was "really wired" by this point. He unsuccessfully tried to feed cocaine to his fish. Defendant continued to use cocaine as he played "Axis and Allies," a board game, and also smoked some marijuana. Around midnight he took "several hits from a bong" of marijuana. When he went to his downstairs room at 12:30 a.m. on March 21 he snorted the last of his cocaine. He then "punched out" an entire card of 12 Co-Tylenol tablets and swallowed them in his self-described suicide attempt. The maximum recommended dosage is two tablets.
[2] Defendant concedes that the charge read to the jury used the word "insufficient" and that the use of the word "sufficient" is a transcription error.