702 A.2d 489

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. MORRIS
ALLEN JACKMON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 15, 1997—Decided October 31, 1997.

Before Judges CONLEY, WALLACE and CARCHMAN.

*Stephen W. Kirsch,* Assistant Deputy Public Defender argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney; *Mr. Kirsch* of counsel and on the brief).

*Linda A. Shashoua,* Acting Assistant Prosecutor argued the cause for respondent (*Lee A. Solomon,* Acting Camden County Prosecutor, attorney; *Ms. Shashoua* of counsel and on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

■ This appeal from murder and other related convictions arises from an armed drug robbery involving three perpetrators that either went according to plan, as the State contends, or went awry, according to defendant. At issue are errors in the jury instructions on the accomplice liability and attempted murder charges under *State v. Bielkiewicz,* 267 *N.J.Super.* 520, 632 *A.*2d 277 (App.Div.1993), and *State v. Rhett,* 127 *N.J.* 3, 601 *A.*2d 689 (1992). The errors were not objected to below and thus must be viewed under the rubric of plain error. We conclude that the "possibility of injustice [arising from the errors] is 'sufficient to raise reasonable doubt as to whether the error[s] led the jury to a result it otherwise might not have reached.'" *State v. Hogan,* 297 *N.J.Super.* 7, 21, 687 *A.*2d 751 (App.Div.1997). *See State v. Cook,* 300 *N.J.Super.* 476, 488–89, 693 *A.*2d 483 (App.Div.1996). Errone-

ous jury instructions on matters material to a jury's deliberations are ordinarily presumed to be reversible error. *Ibid.* We conclude the errors here are not harmless and that defendant's murder, attempted murder, and aggravated assault convictions must be reversed.

Either as an accomplice or principal, we cannot be sure which from the jury verdict, defendant was convicted of the first-degree murder of Jamal Scott, *N.J.S.A.* 2C:11–3(a)(1) and (2) (count one); first-degree attempted murder of Lizabeth Rivas, *N.J.S.A.* 2C:5–1, *N.J.S.A.* 2C:11–3a(1) (count four); second-degree aggravated assault upon Johanna Rivera, *N.J.S.A.* 2C:12–1b(1) (lesser included offense of count five); third-degree aggravated assault upon Carmen Rivera, *N.J.S.A.* 2C:12–1b(2) (lesser included offense of count six). Defendant was also convicted of the felony-murder of Jamal Scott, *N.J.S.A.* 2C:11–3a(3) (count two); first-degree armed robbery, *N.J.S.A.* 2C:15–1 (count three); second-degree possession of a weapon for unlawful purposes, *N.J.S.A.* 2C:39–4a (count seven); and third-degree possession of a firearm without a permit, *N.J.S.A.* 2C:39–5(b) (count eight). At sentencing, counts two (attempted murder of Jamal Scott) and seven (possession of a weapon for an unlawful purpose) were merged into count one (murder of Jamal Scott). An aggregate term of life plus thirty-five years of imprisonment, forty-five years to be served without parole eligibility, was imposed. The court sentenced defendant on each count as follows: on count one, first-degree murder, life imprisonment, thirty years without parole; on count three, first-degree robbery, twenty years imprisonment, ten years without parole, concurrent to the sentence imposed on count one; on count four, attempted murder, twenty years imprisonment, ten years without parole, consecutive to the sentence imposed on count one; on count five, second-degree aggravated assault of Lizabeth Rivera, ten years imprisonment, five years without parole, consecutive with the sentences imposed on counts one and four; on count six, third-degree aggravated assault of Carmen Rivera, five years imprisonment, consecutive to the sentences imposed on counts one, four and five; on count eight, unlawful possession of a

weapon, five years imprisonment concurrent with the other sentences. The necessary fines and penalties were also imposed.

After defendant's notice of appeal was filed, we remanded the matter to the trial court for resentencing on the armed robbery conviction (count three) to a mandatory extended term pursuant to *State v. Haliski,* 140 *N.J.* 1, 656 *A.*2d 1246 (1995). Pursuant to that remand, the trial court imposed a mandatory extended term on count three of forty years imprisonment, twenty years without parole, to run concurrent with the sentences previously imposed.

*I*

The State's evidence was the following. During the evening of July 20, 1991, Johanna Rivera, Jamal Scott, his girlfriend Carmen Rivera (Johanna's sister), eleven year old Lizabeth Rivas and Lizabeth's younger sister, were at Santa Diaz' house at 572 Raritan Street in Camden. Jamal was a local drug dealer for whom Johanna would sometimes sell drugs. Johanna and Jamal were sitting at the dining room table "capping up" [1] cocaine when Lance Phillips (Poppa Lance) came into the house around 4:30 a.m. Carmen testified that Jamal showed Poppa Lance the supply of cocaine, almost one kilogram. After about twenty minutes, Poppa Lance left and Johanna went to sleep in the living room.

A few minutes after Poppa Lance left, Jamal and Carmen went outside to sit on the porch. They were outside for less than one hour when a car they had never seen before, a blue-green Honda Accord, drove past with one person inside. Moments later, when the car came back again, three men dressed in black with ski masks over their heads jumped out of the car and ran toward the house. Jamal grabbed the bag of drugs next to him, ran into the house and attempted to close the door.

The three men ran to the house, one of them grabbed Carmen by the shirt, pushed her and unsuccessfully shot her with a "silver

---

[1] "Capping" is a method of placing processed crack cocaine into small vials.

gun." She escaped unharmed into the bushes. She described the shooter as tall and "brown-skinned." When asked by police if any of her friends fit the description of the man, she replied Poppa Lance, but added "I wouldn't think it was him because we were friends, you know?"

Inside the house Johanna Rivera, seventeen years old at the time, awoke to a "very loud noise." She saw Jamal "struggling against the door" as people were trying to push their way inside. Johanna saw a gun come through the crack of the door and someone shot Jamal in the back. Struggling with one man, Jamal pushed his mask up and eleven year old Lizabeth recognized Poppa Lance. According to Johanna, two of the men shot Jamal "about five times."

One of the men asked Johanna where "the stuff" was and she told him that Jamal had it. Then Johanna ran from the living room and laid on the floor in between the dining room and the kitchen. She testified that a "tall dark-skinned" man came into the kitchen and attempted to shoot her with a black gun, but missed. A second man, whom she described as tall, stocky and "light-skinned" with a chrome .45 caliber handgun, shot her in the right arm. She did not see the third man with a gun. Johanna saw the "tall dark-skinned guy" walk upstairs and he stayed there for three to five minutes. While she heard him come downstairs and heard a gun go off, she did not look up again until she heard the door slam as the men left.

Santa Diaz was in the front upstairs bedroom with her seven year old son, Samuel, when she heard a noise that sounded like "firecrackers." Santa testified that a man came up the stairs, pointed a gun at her and asked if she had any drugs. The man was thin, black, approximately six feet tall and dressed in black with a mask. At the side of the bed, he grabbed a plate covered by a towel and went downstairs. Eleven year old Lizabeth testified that when the man came back downstairs, he picked her up by her hair, kicked her and shot her in the chest. After the three men left, the tall dark-skinned man returned for a few

seconds, went directly to Jamal, grabbed a bag of drugs from underneath his leg and left. The men then drove away to South Camden where they abandoned the car, including a bag containing the black clothing and the guns, at the corner of Newton and Trenton Avenues.

Johanna Rivera suffered a gunshot wound to her upper right arm. Lizabeth Rivas suffered a collapsed lung and a gunshot wound to her upper right chest, four inches above her heart. Jamal Scott died from the combined effects of nine gun shot wounds to the head, trunk and right arm.

Police recovered seven nine-millimeter casings, five nine-millimeter bullets, nine .45 caliber casings and six .45 caliber bullets. Two additional .45 caliber bullets were recovered from Jamal's body. Ballistics testing showed that five nine-millimeter bullets were fired from the same gun, seven nine-millimeter casings were fired from the same gun, six .45 caliber bullets were fired from the same gun, and nine .45 caliber casings were fired from the same gun. There were, then, two guns fired at the scene, a nine millimeter and a .45 caliber. Neither the casings nor the bullets matched any recovered weapon.

While Lizabeth was in the hospital, the police showed her eight photographs and she identified Poppa Lance as the man who shot Jamal. The police interviewed him and based on his statement, decided to question defendant.

In his taped police statement, defendant stated that Poppa Lance asked him to "stick up some guy from Raritan Street named Jamal." The plan was solely to get drugs by means of "a stick up, you go in, you lay people down, you take what you went there for and you get out." Defendant supplied a bag containing a black nine-millimeter gun and an Intertech Tech–9 nine-millimeter gun. Although Poppa Lance had his own weapon, a nickel plated .45 caliber handgun, he requested two additional guns. Defendant denied entering the house with any weapon and, indeed, it appears that only two of the three robbers were involved in the shootings. During the incident, defendant admitted that he wore gloves and a

bulletproof vest under his clothing for protection. He explained that since he was the only one with gloves on, he had to touch everything and everybody. Although Poppa Lance had told defendant he "was thinking 'bout doing everybody" in the house "because they know that he was the last person that was in there," defendant claimed that he and the third man thought they had talked him out of it. However, he said he heard a shot when Poppa Lance first encountered "the girl" on the front porch and Poppa Lance fired another shot at Jamal as they forced their way into the house. Once inside the house, defendant went into the back rooms to "sweep," everybody down and he pulled one girl to the ground by the shoulders. Defendant admitted going upstairs to "sweep" where he encountered a woman and a boy. The woman directed him to a plate covered with a towel which contained crack. When defendant came downstairs with the plate, he said he heard four more shots and noticed Jamal "had a lot of holes in him." As defendant searched Jamal and the third man stood outside, he said he heard another shot and saw Poppa Lance standing over the "little girl" pointing a gun at her. Underneath Jamal's leg, defendant found a blue and white paper bag with a large clear plastic sandwich bag inside containing a white substance. Defendant said in his statement that he and the third man were angry at Poppa Lance for shooting people inside the house.

Defendant gave police written permission to search a storage bin in Pennsauken where they seized a Mossberg shotgun, an empty case for an Intertech Tech 9 gun and several other guns. The police also found a black gym bag containing black clothing, but it did not have any blood on it. Defendant's fingerprints were not found on any of these items. As we have said, none of the casings nor bullets found at the scene matched the weapons seized.

In contrast to his police statement, defendant testified during the *Miranda* hearing held on the second day of trial that he cooperated with the police and gave them a statement in order to

protect his family. He said he either made up the information he gave in his taped statement or used information he had heard on the streets.

## II

On appeal defendant raises the following contentions:

POINT I THE JURY INSTRUCTIONS ON ACCOMPLICE LIABILITY DID NOT COMPLY WITH *STATE V. BIELKIEWICZ.*

POINT II THE JURY INSTRUCTIONS ON ATTEMPTED MURDER DID NOT COMPLY WITH *STATE V. RHETT.*

POINT III DEFENDANT'S FOUR CONSECUTIVE SENTENCES ARE EXCESSIVE.

In a *pro se* supplemental brief, defendant contends:

POINT I DEFENDANT WAS DENIED DUE PROCESS BY THE FAILURE OF THE STATE TO PROVIDE HIM WITH A FAST AND SPEEDY TRIAL AS GUARANTEED BY THE CONSTITUTION OF NEW JERSEY AND THE UNITED STATES.

POINT II THE TRIAL COURT FAILED TO GIVE AN INSTRUCTION ON UNANIMITY OF THE JURY'S VERDICT, TO NOT COMPROMISE OR DO VIOLENCE TO ONE'S INDIVIDUAL JUDGMENT OR CONSIDERATION.

POINT III THE TRIAL COURT ERRED IN FAILING TO GRANT A CONTINUANCE DUE TO A DEATH IN DEFENSE COUNSEL'S FAMILY, RESULTING IN A DENIAL OF DEFENDANT'S RIGHT OF EFFECTIVE COUNSEL.

POINT IV DEFENDANT WAS DEPRIVED OF HIS RIGHT OF A FAIR TRIAL WHEN INVESTIGATOR FOLKS REVEALED TO THE JURY THAT DEFENDANT HAD PAST DEALINGS WITH THE POLICE.

Following the remand for resentencing on the armed robbery conviction, defendant filed a supplemental brief in which he contends the extended sentence is violative of *State v. Dunbar,* 108 *N.J.* 80, 527 *A.*2d 1346 (1987).

We have carefully considered all of these contentions in light of the entire record and applicable law. We are convinced points I through IV of the *pro se* supplemental brief are without merit and require no further opinion. *R.* 2:11–3(e)(2). We are, however, convinced that points I and II of defendant's main brief require reversal of the murder, attempted murder, and aggravated assault convictions. Defendant's sentencing contentions in point III, therefore, are moot. However, as to defendant's contention on

remand that the extended armed robbery term is violative of *State v. Dunbar*, 108 *N.J.* 80, 527 *A.*2d 1346 (1987), we disagree. *State v. Jefimowicz*, 119 *N.J.* 152, 160, 574 *A.*2d 428 (1990).

## III

■ Defendant argues that the trial court's jury charge on accomplice liability did not comply with principles established in *State v. Bielkiewicz*, 267 *N.J.Super.* 520, 632 *A.*2d 277 (App.Div. 1993), and that his convictions for all but the weapons offenses should be reversed and remanded for retrial. In pertinent part the charge included the following:

> Now, what would make Morris Jackmon an accomplice? A person is an accomplice of another person in the commission of a crime when, with the purpose of promoting or facilitating the commission of the crime, he does one of several things. He either solicits the other person to commit the crime, and/or aids, agrees or attempts to aid such other person in planning or committing the crime. Therefore, the State must prove beyond a reasonable doubt that, one, Lance Phillips or Leonard Paulk, Jr. committed the crimes of murder of Jamal Scott, attempted murder of Lizabeth Rivas and/or attempted murder of Johanna Rivera, Carmen Rivera; and, two, that Morris Jackmon acted purposely to promote *it*; that is, to bring *it* into being, to advance *it*, to launch *it* or facilitate; that is, *to make it easier to accomplish the crime of murder and/or attempted murder.*
>
> There's that word "purpose" again. One acts purposely if he does what he means to do; when it's his conscious object to engage in conduct of that nature and to cause such a result.
>
> And the third element the State has to prove beyond a reasonable doubt is that the—Morris Jackmon either solicited Lance Phillips or Leonard Paulk, Jr. to commit the *crime of [sic] Jamal Scott, attempted murder of Lizabeth Rivera Rivas or attempted murder of Johanna Rivera and Carmen Rivera.*
>
> To solicit means to strongly urge, suggest, entice, lure, proposition or aid. Aided the efforts of another meaning assisted, supported or supplemented the efforts of the other. Or agreed to aid, meaning encouraged by promise of support. Or attempted to aid, meaning that Morris Jackmon took substantial steps in the course of conduct designed to or planned to lend support or assistance in the efforts of the others *to cause the commission of the substantive crimes of murder and/or attempted murder.*

> . . . . . . . .

> While mere presence at the scene of the perpetration of a crime does not render a person a participant in that crime, proof that one is present at the scene without disapproving or opposing it is evidence from which, in connection with other circumstances, it's possible for the jury to infer that he assented thereto, lent to it

his countenance and approval and was thereby aiding and abetting the crimes. It depends upon the totality of the circumstances as those circumstances appear from the evidence. *However, one cannot be held to be an accomplice unless you find as a fact that he possessed the same criminal state of mind, purposefulness or knowingly, that's required to be proved against the person who actually committed the act.*

*An accomplice may be convicted on proof of the commission of a crime or of his complicity therein though the person who it is claimed committed the crime has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity from prosecution or conviction or has even been acquitted.*

*However, remember, one cannot be held to be an accomplice unless you find that he possessed the same criminal state of mind that is required to be proved against the person who actually committed the criminal act.*

In order to convict Morris Jackmon as an accomplice to the crimes charged, *you must find that he had the purpose to participate in those particular crimes.* He must act with purpose of promoting or facilitating the commission of the substantive offense with which he's charged. It's not sufficient to prove only that Morris Jackmon had knowledge that the co-defendants were going to commit the crimes charged or that Morris Jackmon knowingly facilitated the commission of the crimes charged. The State must prove not only that he acted knowingly, but also that it was his conscious objective *that the specific crimes of murder and or attempted murder that are charged be committed.*

[Emphasis added.]

 Under *N.J.S.A.* 2C:2–6c(1)(b), an accomplice is a person who, with the purpose of promoting or facilitating another person in the commission of an offense, aids or agrees or attempts to aid the other person in planning or committing the offense. Thus, a jury must be instructed that to convict a defendant as an accomplice, it must find that he or she "shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act." *State v. Fair,* 45 *N.J.* 77, 95, 211 *A.*2d 359 (1965). However, parties who participate in a criminal act may have different levels of intent and thus, may be guilty of a higher or lower degree of the crime, depending on their own actions and state of mind. *Ibid.* Therefore, when a defendant is charged as an accomplice to an offense for which different degrees are submitted to the jury, the trial judge must "carefully impart[ ] to the jury the distinctions between the specific intent required for the grades of the offense." *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987) (reversing a conviction for armed robbery where

the charge did not require the jury to find that the accomplice had shared the principal's purpose to commit robbery with a weapon). *See State v. Norman,* 151 *N.J.* 5, 36, 697 *A.*2d 511 (1997) ("jury instructions on accomplice liability must include an instruction that a defendant can be found guilty as an accomplice of a lesser included offense even though the principal is found guilty of the more serious offense.").

■ More critically, when a murder is committed by multiple perpetrators, and the case is submitted to the jury under a theory of accomplice liability, the jury should be informed that even if it concludes that the principal committed purposeful or knowing murder, the accomplice can be found guilty of a lesser offense. *State v. Bielkiewicz, supra,* 267 *N.J.Super.* at 533, 632 *A.*2d 277. *E.g., State v. Cook, supra,* 300 *N.J.Super.* at 486, 693 *A.*2d 483 ("[t]hese principles are particularly important where multiple participants engage in a violent attack with the potential for differing states of mind. In such cases, '[t]he liability of each participant for any ensuing crime is dependent on his own state of mind, not on anyone's else's.'" (quoting *State v. Bridges,* 254 *N.J.Super.* 541, 566, 604 *A.*2d 131 (App.Div.1992), *aff'd in part, rev'd in part on other grounds,* 133 *N.J.* 447, 628 *A.*2d 270 (1993))).

Here, the charges on the substantive offenses of murder and attempted murder were submitted to the jury along with charges on the substantive lesser included offenses. The evidence seems fairly clear there were two shooters. But the jury could have concluded that Poppa Lance was the principal shooter. Moreover, there were three perpetrators, only two of whom had guns. Defendant's police statement would have supported a conclusion that while he intended to participate in an armed robbery, he did not intend the shootings that actually occurred, or, given Poppa's assurances, did not enter the house knowing that someone would be killed or seriously injured. The jury could have concluded, under these circumstances, that his mental state as to the murder and attempted murder offenses was one of recklessness and not purposeful or knowing.

Proper instructions on accomplice liability, then, were as critical here as they were in *State v. Bielkiewicz, supra.* In *Bielkiewicz,* the victim got into a fight with co-defendant Pitts. When it appeared the victim was winning the fight, Bielkiewicz and another individual came to Pitts' assistance. As the victim was attempting to drive away, Pitts fired two shots into the victim's truck and killed him. The trial judge did charge the jury on the lesser included offenses of aggravated manslaughter, manslaughter and assault. But he did not inform the jury that it could find Pitts guilty of murder as a principal and Bielkiewicz guilty of these lesser included offenses as an accomplice in his accomplice liability charge. *Bielkiewicz, supra,* 267 *N.J.Super.* at 531, 632 *A.*2d 277. The jury convicted both men of purposeful or knowing murder. *Id.* at 523, 632 *A.*2d 277. We reversed Bielkiewicz's conviction for murder finding that, if the jury had been adequately instructed on accomplice liability, it might have found that Bielkiewicz acted with the purpose of aiding Pitts in assaulting the victim, but not with the purpose of causing death or serious bodily injury. *Id.* at 535, 632 *A.*2d 277.

In doing so, we noted that the trial judge's faulty instructions were drawn from the Model Criminal Jury Charge on accomplice liability (approved October 17, 1988), but criticized that charge for failing to explain adequately that a jury may find an accomplice guilty of a different degree of an offense than the principal if the accomplice has a different intent. We said:

> while the court properly instructed the jury that a defendant must have "the purpose to promote or facilitate the crime of purposeful or knowing murder" to be found guilty of murder as an accomplice, it did not inform the jury that a defendant could be found guilty as an accomplice of aggravated manslaughter, manslaughter or assault. In fact, the court did not even mention accomplice liability in instructing the jury with respect to these lesser included offenses. The court also did not inform the jury that it could find one defendant guilty of murder as a principal and the other defendant guilty of aggravated manslaughter, manslaughter or assault as an accomplice. Indeed, the court implied the contrary when it told the jury that "one cannot be held as an accomplice unless you find as a fact that he shared the same purpose required to be proven against the person who actually committed the act."
>
> [267 *N.J.Super.* at 531, 632 *A.*2d 277.]

We recognized that one paragraph of the Model Charge, not included in the *Bielkiewicz* charge, "obliquely" refers to the concept of different mental states of a principal and an accomplice:

> *An accomplice may be convicted on proof of the commission of a crime of (his/her) complicity therein, though the person who it is claimed committed the crime* has not been prosecuted or convicted or *has been convicted of a different offense or degree of offenses* or has an immunity from prosecution or conviction or has been acquitted.
>
> [*Id.* at 532 n. 2, 632 *A*.2d 277 (quoting *New Jersey Model Jury Charges, Criminal, Complicity, N.J.S.A.* 2C:2–6 at 8) (emphasis added).]

But we found this insufficient and also observed that the charge failed to explain the kind of jury findings which may warrant accomplice liability where differing culpable mental states were possible. In doing so we said "[s]pecifically, the model charges do not inform the jury that an accomplice who has a different intent than the principal may be found guilty of a different degree offense. Moreover, other parts of the model charges, which were used by the trial judge, seem to indicate that accomplice liability must be predicated upon a finding that the accomplice has the same intent as the principal." *Bielkiewicz, supra,* 267 *N.J.Super.* at 532 n. 2, 632 *A*.2d 277. We suggested that the Model Charge be revised.[2]

Here, the trial judge used almost the exact charge as was used in *Bielkiewicz,* and reemphasized it when the jury asked for a recharge on accomplice liability. While the charge does include the "oblique" language noted above which indicates the jury may find an accomplice guilty even though the principal has not been convicted or has been convicted of a different offense, this language simply is not sufficient. *Bielkiewicz, supra,* 267 *N.J.Super.*

---

[2] The present Model Criminal Jury Charge on accomplice liability, revised May 22, 1995, includes two changes relevant to the *Bielkiewicz* decision. First, it drops the following sentence: "However, one cannot be held to be an accomplice unless you find that (he/she) possessed the same criminal state of mind that is required to be proved against the person who actually committed the criminal act. . . ." Second, the revision adds the following reminder: "(Again, remind the jury to consider the accomplice status separately as to each charge)." We express no view as to whether the new charge is sufficient.

at 532 n. 2, 632 *A.*2d 277. *Accord State v. Cook, supra,* 300 *N.J.Super.* at 488, 693 *A.*2d 483. Like the trial judge in *Bielkiewicz,* the trial judge here conveyed to the jury the notion that accomplice liability must be predicated upon a finding that the accomplice had the same intent as the principal. He charged:

> However, remember, one cannot be held to be an accomplice unless you find that *he possessed the same criminal state of mind that is required to be proved against the person who actually committed the criminal act.*
>
> [Emphasis added.]

This was the predominant theme of the accomplice liability charge and was repeated several times.

■ Additionally, although the jury was given instructions on the substantive lesser included offenses, the judge did not refer to these lesser included offenses in the context of the accomplice liability charge to indicate that if the jury found Poppa Lance was purposeful and knowing in his shootings but defendant was not, they might still find him guilty as an accomplice but of a lesser offense if his mental state was less culpable. Thus, while substantive charges on lesser included offenses were given, we reject the State's contention that that fact alone is sufficient to convey the key holding of *Bielkiewicz* that not only is it defendant's state of mind that must be the focus of the jury's deliberations, but the jury must understand that defendant's culpable mental state can be lesser than that of the principal where it is accomplice liability that convicts the defendant. Simply charging a jury on the substantive lesser included offenses can not clearly convey that thought without some corresponding equivalent language in the accomplice liability portion of the charge. And we reject the State's suggestion that because defendant was tried alone, the *Bielkiewicz* principles are not applicable. *State v. Cook, supra,* 300 *N.J.Super.* at 488, 693 *A.*2d 483 ("[i]n this case [defendant], the prime mover, was as present in the court room as if he had been physically there himself.").[3] *Compare State v. Scherzer,* 301

---

[3] We do not read *State v. Norman, supra,* 151 *N.J.* at 39, 697 *A.*2d 511, to the contrary. To begin with, consideration of the *Bielkiewicz* error was in the

N.J.Super. 363, 475, 694 A.2d 196 (App.Div.), *certif. denied,* 151 N.J. 466, 700 A.2d 878 (1997).

■ The difficult issue here is whether the failure to comply with *Bielkiewicz* is reversible error. In *State v. Cook, supra,* 300 N.J.Super. at 484–85, 693 A.2d 483, jury instructions on accomplice liability were almost identical to those here. The defendant, Cook, had held the victim's legs while co-defendant dealt fatal blows. Like the defendant in the present case, Cook claimed that he and co-defendant intended to rob the victim, not murder him. We concluded under this scenario that the effect of the error in the accomplice liability charge "was to obfuscate the possibility that [co-defendant] purposely committed the murder, and that [defendant], while a participant in the specific action which resulted in the victim's death, did not intend the victim to be killed or to suffer serious bodily harm." *Id.* at 487, 693 A.2d 483. Noting the need for clear and correct jury instructions and that such errors are " 'poor candidates for rehabilitation under the harmless error philosophy,' " *State v. Brown,* 138 N.J. 481, 522, 651 A.2d 19 (1994), we said in *Cook,* "[w]e are satisfied, as was the panel in *Bielkiewicz,* that the accomplice instruction given here was inadequate to guide the jury in the course its deliberations should take regarding the murder charge. As such, it was capable of producing an unjust result." 300 N.J.Super. at 489, 693 A.2d 483. *See State v. Tucker,* 280 N.J.Super. 149, 153, 654 A.2d 1014 (App.Div. 1995) (reversing defendant's conviction for robbery where the trial judge failed to give the jury instructions which incorporated the

context of a post-conviction ineffective assistance of counsel claim. More importantly, the Court observed that the accomplice liability instructions were expressly, and exhaustively, made applicable not only to the murder offense, but the lesser included offenses as well. And so, unlike the charge here, the court was confident in saying "[t]hus, the jury was well aware of the alternative offenses and was . . : aware that the accomplice instructions applied to them." 151 N.J. at 39, 697 A.2d 511. The fact that defendant was separately tried, though mentioned by the court, *ibid,* was not critical to the conclusion that the accomplice liability charge had informed the jury of the differing available mental states.

facts of the case and which explained the possible difference in the state of mind of the principal and the accomplice concerning robbing the victim).

In *State v. Williams,* 298 *N.J.Super.* 430, 440, 689 *A.*2d 821 (App.Div.), *certif. denied,* 150 *N.J.* 27, 695 *A.*2d 669 (1997), the defendant was indicted on murder but convicted of the lesser included offense of aggravated manslaughter, along with related weapons offenses. The state presented the case on alternative principal/accomplice theories. The facts were thus:

> Maurice Whitley testified that while he was driving his car in Newark around midnight on April 23, 1993, defendant and Martin waved for him to stop and asked for a ride. After they got into the car, defendant told Whitley that they were searching for someone who had just given him "false money" for drugs. Shortly thereafter, they picked up Widemond and continued their search. At some point, defendant and Martin saw someone who looked like the person who had taken the drugs, and they told Whitley to stop the car. As defendant, Widemond and Martin were getting out of the car, Whitley saw a gun in the hand of one member of the group, whom he identified as Widemond in pretrial statements to the police. Widemond and Martin began running towards what Whitley characterized as "the graveyard," and defendant ran in another direction. Whitley then drove away and did not observe the killing. Two police officers on patrol heard the sound of four gunshots around the same time and in the same vicinity where Whitley let defendant, Widemond and Martin out of his car. Shortly thereafter, the officers apprehended defendant and Martin walking out of an alley near the graveyard. The officers subsequently found the victim's body in the alley. Another witness testified that he heard three shots outside his bedroom window, located near the alley, and that just before the third shot, he heard someone say, "shoot him."
>
> [*State v. Williams, supra,* 298 *N.J.Super.* at 435, 689 *A.*2d 821.]

The jury charge, as here, did not instruct the jury that defendant, if considered as an accomplice, might be involved in the underlying incident but with a lesser mental state than the actual murderer and thus could be found guilty of a lesser offense even though the principal might be guilty of murder. The charge was similar to the one here, except that it made some effort to comply with *Bielkiewicz* by including:

> An accomplice may be convicted of a lesser included offense of murder depending upon the state of mind with which you find that defendant acted based upon the evidence that pertains to him.

Nonetheless, we said:

> Thus, although the trial court informed the jury that an accomplice may be found guilty of a lesser included offense if he did not have the state of mind required for

murder, the court did not instruct the jury that an accomplice may be found guilty of only aggravated or reckless manslaughter even though the principal or another accomplice is found guilty of murder. *Therefore, if defendant had been found guilty of murder, we would be restrained to reverse his conviction.*

[*State v. Williams, supra,* 298 *N.J.Super.* at 440–41, 689 *A.*2d 821 (emphasis added).]

In other words, had defendant been convicted of murder, as was defendant here, we would not have found the error in the charge harmless. We did, though, conclude it was harmless because defendant was convicted of aggravated manslaughter which has the same mental state (reckless) as the lower/lesser included manslaughter. 298 *N.J.Super.* at 441, 689 *A.*2d 821. That circumstance does not exist here.

On the other hand, in *State v. Scherzer, supra,* 301 *N.J.Super.* 363, 694 *A.*2d 196, while the trial judge did not in his accomplice liability charge specifically instruct the jury that it could convict one defendant as a principal of first-degree aggravated sexual assault and another defendant as an accomplice of a lower-grade offense, his failure to do so under the circumstances was not plain error, for

[l]ater in the charge, the judge told the jury it *must* determine each defendant's guilt or innocence on each charge separately. In addition, the judge carefully explained each of the lesser-included offenses of each count and how they related to each defendant, and the verdict sheet had the appropriate defendants names next to each of the charges and lesser-included offenses.

[*Id.* at 475, 694 *A.*2d 196.]

Since defendant here was tried alone, similar instructions were not present in the jury charge.

In *State v. Norman,* too, the *Bielkiewicz* error was deemed harmless because the evidence was overwhelming that defendants shared a murderous intent and there was no evidence to infer any difference in the defendants' mental states. *State v. Norman, supra,* 151 *N.J.* at 38, 697 *A.*2d 511. ("[defendants] armed themselves with high-powered guns and set up an ambush. When the ambush was uncovered and the intended victim fled, they pursued with guns in hand. Either [one or the other] or both of them fired numerous shots at the target ... [t]here is simply no reasonable

view of the evidence that would permit one to conclude that defendants fired the shots or aided in the firing of the shots with anything less than homicide in mind."). *And see, State v. Eure,* 304 *N.J.Super.* 469, 472, 701 *A.2d* 464 (App.Div.1997) ("[g]iven defendant's role in the theft and the nature of the offense, we are satisfied—particularly because the jury was charged on various lesser included offenses to robbery, including the theft of which defendant was convicted and the unlawful taking of a means of conveyance—that the [erroneous accomplice liability] instruction as a whole did not constitute 'plain error.' ").

We reached a similar result in *State v. Rue,* 296 *N.J.Super.* 108, 686 *A.2d* 348 (App.Div.1996), *certif. denied,* 148 *N.J.* 463, 690 *A.2d* 611 (1997). There, when an altercation arose between the victim and co-defendant Dodson, Dodson called some additional men, including defendant, for assistance. Upon their arrival, they proceeded to beat the victim in the head with guns. Defendant testified that he only intended "to scare" the victim and was unaware of anyone's intention to kill him. Furthermore, defendant claimed he actually remained in the back seat of the car when the others got out and was not at all involved. *Id.* at 113–14, 686 *A.2d* 348. As in *Bielkiewicz,* the accomplice liability instructions omitted telling the jury that it could find the principal (Dodson) guilty of murder and the accomplice (defendant) guilty of a lesser offense. *Id.* at 115, 686 *A.2d* 348. However, we distinguished *Bielkiewicz* stating:

> The difference between this case and *Bielkiewicz* is that evidence in that case could have supported a finding that defendant Bielkiewicz did not share Pitts' homicidal state of mind. A jury could reasonably have concluded from his actions that Bielkiewicz was intent on inflicting bodily injury on the victim to help Pitts win the fight, but that he did not share Pitts' intent to cause death or serious bodily injury. That is not the case here.
>
> [*State v. Rue, supra,* 296 *N.J.Super.* at 115, 686 *A.2d* 348.]

We pointed out that two possible scenarios had been presented to the jury: (1) the defendant himself participated in a vicious beating which killed the victim; or (2) the defendant remained in the car and did not participate in the crime at all. *Ibid.* Yet neither scenario warranted a *Bielkiewicz* charge because in the

first scenario the defendant's culpability was as a principal; in the second scenario the defendant was not guilty of a crime at all. *Ibid.But see State v. Cook, supra,* 300 *N.J.Super.* at 488, 693 *A.*2d 483, where the State had similarly argued that the *Bielkiewicz* error was harmless because of defendant's "all-or-nothing" defense (i.e., his denial of participating at all in the beating of the victims). In rejecting this argument, we said "[t]his is not so. Once the jury rejected Cook's story as to his non-complicity in the events leading up to the victim's death ... it was required to apply correct legal principles to assess Cook's liability under the State's own version of the events." *Ibid.* at 488, 693 *A.*2d 483.

The State argues here that defendant's convictions for murder and attempted murder, under counts one and four, respectively, were crimes which involved such life-threatening injuries that the only intent possible would have been a purpose to kill, and thus, that the facts here are closer to *Rue* than to *Bielkiewicz.* The evidence showed that Jamal died from nine gunshot wounds to the head, trunk and right arm. Lizabeth was shot in the chest, four inches above her heart, by someone who had just come down the stairs. According to the State, based on these facts, a differentiation between the defendant's culpability and that of the other perpetrators was not possible.

We disagree. Simply stated, the injuries might be indicative themselves of a purposeful or knowing mental state, but they do not establish which of the three perpetrators possessed that mental state. Other than Poppa Lance, none of the victims could identify the other two assailants. Most certainly defendant's police statement established his purposeful and knowing involvement in an armed robbery. But, if believed, it could show no more than recklessness as an accomplice to the shootings. And, though defendant testified during the *Miranda* hearing that he was not in the house at all, it is his police statement that the jury heard and seems to have focused upon, for shortly after deliberations began, they asked whether if that statement is believed, it placed defendant on the scene.

This is not, then, a scenario in which only one mental state on the part of defendant was possible or in which the jury could have only concluded that defendant acted as a principal. In this respect we are convinced the circumstances here are closer to *Bielkiewicz, Cook* and *Williams* than to *Rue* or *Norman*. And the additional factors in the overall charge found to render the same error harmless in *Scherzer* are not present here.

We reject the State's contention that defendant's conviction of the felony-murder renders the error harmless. In this respect, the State contends that defendant's guilt of felony-murder "clearly indicates the jury considered defendant as a principal." Felony-murder, however, is not an accomplice liability offense and the accomplice liability charge did not encompass felony-murder. Moreover, the predicate felony was the armed robbery. As to that offense, the State most likely is correct that defendant may well have been convicted as a principal, for that clearly is what he admitted to in his police statement. But the same can not be said for the murder and attempted murder offenses. *Cf. State v. Crisantos (Arriagas),* 102 *N.J.* 265, 272, 508 *A.*2d 167 (1986) ("the fact that the jury . . . convicted [defendant] of felony murder does not necessarily mean that it would have returned the same verdict if manslaughter had also been charged [as a lesser included offense of murder].").

The question that remains is which of defendant's convictions are affected by the error. It is clear that the weapons convictions are not. *See State v. Cook, supra,* 300 *N.J.Super.* at 489–90, 693 *A.*2d 483. Neither do we think the armed robbery conviction is affected. While the trial judge did, after the initial instructions which we have previously set forth, tell the jury the robbery was also encompassed in the accomplice liability charge, we think it plain there was no evidence to support anything other than a first-degree robbery for, while defendant in his police statement denied any purposeful or knowing mental state as to shooting anyone, he did clearly admit to a robbery with the use of guns, "a stick up." And, while his testimony during the *Miranda* hearing held on the

second day of trial was that he was not present at all, that would support an acquittal had the jury heard that testimony, not a second-degree robbery. With respect to the armed robbery, then, the evidence is such that any error was harmless. In this respect, we are convinced *State v. Rue* and *State v. Norman* are apposite.

Neither do we believe that the felony-murder is affected. Accomplice liability was not given with respect to this offense. *See State v. Cook, supra,* 300 *N.J.Super.* at 489, 693 *A.*2d 483 ("[t]he accomplice instruction was not given with respect to the theft of moveable property count, thus obviating the possibility that that instruction negatively impacted on that conviction."). Defendant's reliance upon *State v. Crisantos (Arriagas), supra,* 102 *N.J.* at 270–72, 508 *A.*2d 167, is misplaced. The Supreme Court did not hold that an error in the manslaughter charge at issue there would render the felony-murder conviction reversible. It said only that such error would not be rendered harmless by the felony-murder conviction. That is quite different.

Defendant also relies upon *State v. Grunow,* 102 *N.J.* 133, 146–49, 506 *A.*2d 708 (1986). There the jury was erroneously charged on passion/provocation in connection with a murder charge. Defendant, however, was acquitted of murder, but convicted of aggravated manslaughter. The court concluded that passion/provocation could not be used to reduce aggravated manslaughter to manslaughter, 102 *N.J.* at 144, 506 *A.*2d 708. Nonetheless, the court reversed the aggravated manslaughter conviction, noting that the State's contention that the error did not extend to that conviction "assumes one major premise that we cannot accept: it assumes that the jury inevitably proceeded on a step-by-step basis to consider murder first, and then aggravated manslaughter." 102 *N.J.* at 146, 506 *A.*2d 708. Since, if properly charged the jury could have found passion/provocation was involved and then convicted only of manslaughter, the aggravated manslaughter conviction was reversed.

We do not think *Grunow* is particularly relevant in the context of the felony-murder conviction here. The underlying predicate

was the armed robbery. There was no sequential verdict problem as to that offense. In whatever manner the jury may have considered the murder, attempted murder and lesser included offenses in connection therewith, and in whatever order, that would not have impacted upon their consideration of the felony-murder. We conclude, therefore, that the error in the accomplice liability charge does not require a reversal of defendant's felony-murder conviction.

We do, on the other hand, conclude that the error does require reversal of the convictions on the second and third degree assaults as lesser included offenses of attempted murder. In this respect, we think the reversal of the aggravated manslaughter in *Grunow* is comparable. To be sure, the convictions of second and third degree assault pursuant to *N.J.S.A.* 2C:12–1(b)(1) and (2)[4] were lesser included offenses, but the jury was charged, as well, on *N.J.S.A.* 2C:12–1(b)(3)[5], a fourth degree aggravated assault. Although one of the available culpable mental states under *N.J.S.A.* 2C:12–1(b)(1) is recklessness, to which the accomplice liability error would not apply, *State v. Williams, supra,* 298 *N.J.Super.* at 441–42, 689 *A.*2d 821, purposeful and knowing are also available culpable mental states. We can not tell from the jury verdict which was the predicate mental state for the 2C:12–1(b)(1) conviction. And under *N.J.S.A.* 2C:12–1(b)(2) purposeful or knowing are the required culpable mental states. In contrast, recklessness only is the culpable mental state under *N.J.S.A.* 2C:12–1(b)(3). The jury convictions of the aggravated assaults, therefore, were not convictions of the least available culpable mental state, that is

---

[4] Pursuant to *N.J.S.A.* 2C:12–1(b)(1) a defendant is guilty of aggravated assault if he or she "[a]ttempts to cause serious bodily injury to another, or causes such injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury." A defendant is guilty of aggravated assault pursuant to *N.J.S.A.* 2C:12–1(b)(2) if he or she "[a]ttempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon."

[5] A defendant is guilty of *N.J.S.A.* 2C:12–1(b)(3) if he or she "[r]ecklessly causes bodily injury to another with a deadly weapon."

recklessness. As we have said, there is some evidence to support a finding that while defendant participated in the armed robbery, it was not his purposeful or knowing state of mind to shoot anyone and his liability as to those shootings could have been considered as a reckless accomplice. The accomplice liability charge foreclosed that option and, thus, requires reversal of the aggravated assault convictions, as well as the murder and attempted murder convictions. *Contrast State v. Williams, supra,* 298 *N.J.Super.* at 441–42, 689 *A.*2d 821.

## IV

While the crime of murder may be committed with either a purposeful or knowing state of mind, an attempt must be purposeful and no lesser mental state will suffice even if some other mental state could establish the underlying crime. *State v. Rhett,* 127 *N.J.* 3, 5, 601 *A.*2d 689 (1992); *N.J.S.A.* 2C:5–1. A conviction for attempt requires that the particular criminal result be one's "conscious object, the distinguishing feature of a purposeful mental state." *State v. McCoy,* 116 *N.J.* 293, 304, 561 *A.*2d 582 (1989); *N.J.S.A.* 2C:2–2(b)(1).

In the present case, however, the instructions on the attempted murder included the following:

The law provides that a person is guilty of an attempt to commit a crime, if, acting with a kind of culpability otherwise required for the commission of the crime, and here it would be *purposely or knowingly,* the person purposely does something which under the circumstances as a reasonable person would believe them to be is an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

Therefore, *in order to find Morris Jackmon guilty of a criminal attempt of murder, the State must prove* the following elements beyond a reasonable doubt. First, the State must prove *that Morris Jackmon acted with the same criminal culpability as is required for the commission of the murder,* that is, that he acted *purposely or knowingly. This means to be guilty of an attempt to commit a crime Morris Jackmon must have the same state of mind that's necessary to find him guilty of the crime itself.*

[Emphasis added.]

In *State v. Rhett,* the trial judge incorrectly charged the jury that a person "acting purposely or acting knowingly" who "pur-

posely engaged in the conduct which would constitute the crime" is guilty of an attempt. *State v. Rhett, supra,* 127 *N.J.* at 7, 601 *A.*2d 689. The Supreme Court reversed defendant's conviction for attempted murder and remanded for a new trial. *Id.* at 3, 601 *A.*2d 689. "By instructing the jury that it could find defendant guilty of attempted murder on anything less than purposeful conduct, the charge conflicts with the statutory definition of 'attempt.'" *Ibid.* The court stated:

> The erroneous charge is fatal to the conviction. Incorrect instructions of law are poor candidates for rehabilitation under a harmless-error analysis. We have consistently held that incorrect charges on substantive elements of a crime constitute reversible error. *Because of the significant risk that the jury could have misunderstood the requisite level of intent necessary for a conviction on attempted murder, we must reverse that conviction and remand for a new trial.*
>
> [*State v. Rhett, supra,* 127 *N.J.* at 7–8, 601 *A.*2d 689 (citations omitted) (emphasis added).]

Similarly, in *State v. Sette,* 259 *N.J.Super.* 156, 189, 611 *A.*2d 1129 (App.Div.1992), when charging the jury on the state of mind required to convict defendant of attempted murder, the judge directed the jury "they must find that defendant, 'when he stabbed [the victim], did so purposely or knowingly.'" The judge repeated these alternative states of mind several times in the charge and two times during jury deliberations. Although *Rhett* seems to preclude harmless error considerations in this particular context, we nonetheless considered the State's argument that the error in *Sette* was harmless because the trial judge had in other places in the charge correctly instructed the jury. We said "[t]he test to be applied in such circumstances is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." *State v. Sette, supra,* 259 *N.J.Super.* at 190–91, 611 *A.*2d 1129. In response to the State's contention that an erroneous charge may not require reversal when considered in the context of the overall charge, we explained "[t]he key to finding harmless error in such cases is the isolated nature of the transgression and the fact that a correct definition of the law on the same charge is found elsewhere in the court's instructions."

*Id.* at 192, 611 *A.*2d 1129. The error in *Sette* was not isolated or fleeting.

In the present case, the State concedes the trial judge's charge on attempted murder was not "as good as it should have been." However, it urges that when viewed as a whole, the charge does not rise to the level of plain error requiring a reversal of defendant's conviction. *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973) (a jury charge should be examined as a whole in order to determine its overall effect). It is true, as the State points out, at one point in the charge, the trial judge properly instructed the jury that a purposeful state of mind is required and the verdict sheet as well refers just to purpose. And so it contends that the language we have quoted constituted an "isolated fleeting" misstatement of the law.

But while the circumstances here might not be as bad as those in *Sette*, we can not consider those critical portions of the charge as containing merely a fleeting reference to "purposeful or knowing." Not only did the judge tell the jury that a person is guilty of attempt if acting with the mental state otherwise required, and in that context referred to purposeful or knowing, but he also told the jury that the State must prove defendant has the same mental state as that required for the commission of the crime of murder, the charge of which contains repeated references to a purposeful or knowing mental state. Moreover, the entire charge was lengthy and somewhat confusing. We can not be assured that the jury ignored the reference to "knowing" in favor of only "purposeful."

## V

We thus reverse the murder, attempted murder and aggravated assault convictions and remand for further proceedings consistent with this opinion.