# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1434-23
A-1487-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

ANDREW D. MURRAY,

    Defendant-Appellant/
    Cross-Respondent.

_____

Argued November 4, 2024 – Decided November 20, 2024

Before Judges Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 21-05-0435.

Jill R. Cohen argued the cause for appellant/cross-respondent.

Elizabeth K. Tornese, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent/cross-appellant (Elizabeth Parvin, Acting Gloucester County Prosecutor, attorney;

Michael Mellon, Special Deputy Attorney General/Acting Assistant Prosecutor, and Elizabeth K. Tornese, on the briefs).

PER CURIAM

Defendant Andrew D. Murray appeals his April 5, 2023 conviction of second-degree sexual assault. Because we determine the trial court erred in failing to issue a tailored charge to the jury, we reverse and vacate the conviction.

I.

Following introduction through a mutual friend, defendant and the purported victim, C.H., began a friendship in February 2019.[1] The friendship grew into a consensual sexual relationship in August 2019 when defendant helped C.H. and her children move into their new home. In late September 2019, defendant moved in with C.H. A salient aspect of their relationship was the parties' mutual interest in consensual sex with elements of what was termed "rough sex" at trial. This behavior included bondage, role play, and erotic asphyxiation.[2]

---

[1] We use the party's initials in order to preserve their anonymity. See R. 1:38-3(d)(12).

[2] We find it necessary to use sexually graphic terms in our legal analysis to distinguish amongst the various criminal charges.

During their intimate encounters, C.H. would say "stop" or "no" in a "playful manner." Defendant claimed that "the first few times" C.H. said "stop," he asked if he should stop and she responded that she did not "really mean it." From the record, it appears the parties designated the word "pineapple" as a "safe" word, although C.H. maintained that they "joke[d]" about using that safe word but never "seriously" considered it.

On November 1 and November 16, 2019, defendant engaged in sexual activities with C.H. The parties presented differing recollections of the events. The sexual activities that occurred on those dates would later form the basis of C.H.'s sexual assault allegations against defendant in December 2019.

Those allegations led to the arrest and charges against defendant, billed by grand jurors in May 2021. Defendant was indicted with the following offenses: second-degree sexual assault by forcing C.H, to have vaginal sex against her will on November 1, 2019, N.J.S.A. 2C:14-2(c)(1) (count one); second-degree sexual assault by forcing C.H. to have anal sex against her will on November 1, 2019, N.J.S.A. 2C:14-2(c)(1)(count two); third-degree aggravated assault by strangulation on November 1, 2019, N.J.S.A. 2C:12-l(b)(13) (count three); third-degree aggravated assault for causing significant bodily injury by slapping C.H. across her cheek resulting in a cracked tooth on

A-1434-23

November 1, 2016, N.J.S.A. 2C:12-l(b)(12)(count four); second-degree sexual assault by forcing C.H. to have vaginal sex against her will on November 16, 2019, N.J.S.A. 2C:14-2(c)(1)(count five); second-degree sexual assault by forcing C.H. to have oral sex against her will on November 16, 2019, N.J.S.A. 2C:14-2(c)(1)(count six); and third-degree aggravated assault by strangulation on November 16, 2019, N.J.S.A. 2C:12-l(b)(13)(count seven).

November 1, 2019 Events

At the trial that followed in March and April of 2023, C.H. testified that on the evening of October 31, 2019, she had a bonfire with her children and defendant. C.H. claimed that after the children were asleep, she laid in bed with defendant, and he rolled her over and started to kiss her. Although C.H. said she was "tired, . . . he started to get very aggressive, which he had been before, because that's how [their] sex was, but this was very different." C.H. claimed that her pleas for him to "stop" were different from her playful "stop" in their prior encounters, because she "had never told him to stop like that before." Concerned about waking her children, C.H. refrained from yelling or screaming. According to C.H., defendant took off her shorts and underwear, climbed on top of her, "inserted his penis in [her] vagina," put his hands around her throat when she attempted to push him away, pulled her legs over her head, and then "put his

penis in [her] anus." She screamed, cried, started bleeding and shaking uncontrollably.

Defendant's version differed markedly. He testified that after C.H. initiated sex in the shower, they moved into the bedroom. He maintained that this encounter was similar to their prior encounters, in that: (1) he was "rough" with C.H. to her liking; (2) C.H. playfully said "no, no, no" in response to him saying he was "going to put it in [her] ass."; and (3) he told her to "shut . . . up" which "turn[ed] her on even more." C.H. then "grabbed a hold of [him,] pulled [him] down to kiss [him] some more [,] reached down and grabbed [his] penis and started rubbing it on her anus, which she has done many times before, and then she went to . . . push it in, and [they] continued." Defendant asserted that C.H. did not cry and that he did not notice any blood on the white bed sheets.

C.H. claimed she never sought medical attention or reported defendant to the authorities because he apologized and assured her it would not happen again. She maintained defendant reached out via text the next morning, apologizing for the "misunderstanding." Defendant testified that he apologized to C.H. after she told him that he "hurt her." The record makes clear that after defendant apologized, C.H. stated that "she should have said something more at the time" and then sent defendant pictures of herself and the kids. The next day, she

5

started making Christmas plans with defendant, including planning a Christmas photoshoot. It is undisputed defendant continued to live with C.H. and her children following this event.

Regarding the status of their relationship at this juncture, C.H. gave contradictory testimony. Initially, she testified that they "were not sexual at any point after the first incident on November 1st," but then conceded that she had discussions with defendant shortly after the incident about using "a ball gag," "a mouth guard," and "a spreader bar."

On November 12, C.H. looked through defendant's cell phone and learned that he had been in contact with other women without her knowledge. Displeased that defendant might be "seeing someone else behind [her] back[,]" C.H. believed it was in both of their interests to end the relationship. However, C.H. permitted defendant to remain at her house until the end of the year to make his departure a smoother transition for her children, who had formed a good relationship with defendant. Defendant testified that their sexual encounters continued even after they ended their relationship on November 12. According to C.H., it was not until November 15, 2019 that defendant reinitiated sexual contact with her.

A-1434-23

Weekend of November 15, 2019

C.H. testified that on the evening of November 15, she joined defendant on the couch in the living room to watch a movie. Some time later, defendant asked C.H. to "scooch closer" which she did. According to C.H., defendant turned towards her, pulled her down the couch, took off her clothing, and "perform[ed] oral sex on [her]." C.H. maintained that her attempts to push defendant away were futile, and in retaliation, defendant "bit [her] vagina really hard." Defendant climbed on top of C.H. ignoring her protests and loud screams. After she refused to "insert his penis into [her] vagina," he put his hands around her throat and then slapped her so hard that her "tooth crack[ed]." It was only then that C.H. complied with defendant's demands. C.H. testified that she "was crying [and] hysterical." Unable to find her clothes, C.H. ran up the stairs to grab a towel and went back downstairs. When C.H. noticed defendant was looking at his phone with "a smile on his face[,]" she suspected that he was talking to other women. She "grabbed his phone," ran upstairs to the bathroom and confirmed her suspicions.

Defendant's rendition of events was starkly different. He testified that on the evening of November 15, he and C.H. were cuddling on the couch. He conceded performing oral sex on C.H. and "slap[ping]" her, but maintained C.H.

welcomed his sexual advances, made no complaints of pain, and initiated vaginal sex. After intercourse, defendant asserted that C.H. ran upstairs to shower, went back downstairs asking for his phone, "ripped" the phone out of his hands, and then ran back upstairs and locked herself in her room. Defendant followed C.H. upstairs, asked for his phone, and when one of C.H.'s children woke up, he put the child to bed. C.H. then returned defendant's phone and asked him to move out. While defendant was packing his belongings, C.H. texted one of defendant's friends and accused defendant of cheating, making no mention of the alleged assault. Defendant moved out the next morning.

C.H. contended that she was initially reluctant to seek help from the police, because she did not feel comfortable being around men and refused to admit she "was a victim." C.H. testified she reached out to defendant only because it would be "unfair" for her to pay for her cracked tooth. In doing so, she made no mention of the alleged sexual assault.

At the conclusion of the State's case, defense counsel made a <u>Reyes</u> application. <u>State v. Reyes</u>, 50 N.J. 454, 458-59 (1967); <u>R.</u> 3:18-1. The trial court dismissed the aggravated assault by significant bodily injury charge (count four) due to "a lack of medical evidence" and insufficient credible evidence that C.H. suffered significant bodily injury.

Jury Charge Conference

At the jury charge conference, defense counsel requested that the court consider a consent charge. However, the court found the issue of consent was adequately covered in the sexual assault charge. At the close of the evidence, the court charged the jury. On the sexual assault charges, the court issued the model criminal jury charge, administered in relevant part:

> Proof that the act of sexual penetration occurred without the victim's permission can be based on evidence of conduct or words <u>in light of the surrounding circumstances</u>, and must demonstrate beyond a reasonable doubt that a reasonable person would not have believed that there was affirmative and freely given permission. If there is evidence to suggest that the defendant reasonably believed that such permission had been given, the State must demonstrate beyond a reasonable doubt either <u>that the defendant did not actually believe that such permission had been freely given, or that such a belief was unreasonable under all of the circumstances</u>. In determining the reasonableness of defendant's belief that the victim had freely given affirmative permission, you must keep in mind that the law places no burden on the alleged victim to have expressed non-consent or to have denied permission. You should not speculate as to what the alleged victim thought or desired or why she did not resist or protest. The State is not required to prove that the victim resisted. The State is not required to prove that the victim sustained severe personal injury.
>
> [(Emphases added).]

The trial court did not tailor the charge to reflect the idiosyncratic

circumstances of the parties' sexual relationship and the parties' contradictory versions of events.

Jury Deliberations

During deliberations, the jury requested a playback of C.H.'s testimony with regard to a text she sent defendant, dated August 25, 2019, where she stated that it was "worth every bruise." After one day of deliberation, the jury found defendant guilty on count two, second-degree sexual assault by way of anal penetration, but acquitted defendant of all other counts relating to the parties' sexual activity on that day and all sexual charges related to the subsequent sexual activity on November 16.

Thereafter, defendant moved for a judgment notwithstanding the verdict (JNOV) and a new trial. R. 3:18-2; R. 3:20-1. In denying defendant's motion, the trial court determined sufficient evidence was presented, permitting the jury to find defendant's belief in C.H.'s consent was not reasonable. The court also denied a motion for a new trial, determining that defendant's claimed errors were insufficient to warrant such relief.

At the sentencing, the State requested defendant to be sentenced in the second-degree range, maintaining that a term of seven years was appropriate as "the aggravating and mitigating factors are in equipoise." Defendant requested

to be sentenced to probation or, in the alternative, sentenced in the third-degree range, arguing the interests of justice compelled a reduced sentence. Concluding that the mitigating factors qualitatively and quantitatively outweighed the single aggravating factor found, the court sentenced defendant in the third-degree range to a term of three years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The sentence also included Megan's Law registration and parole supervision for life.

## II.

Defendant raises three arguments on appeal.

> I. The State failed to meet its burden of proving defendant's guilt on [c]ount [t]wo of the [indictment.] [The] [c]ourt erred in failing to gran[t] the defendant's motion for judg[]ment notwithstanding the verdict. (raised below)
>
> II. The jury charge as delivered was inadequate as the [j]udge failed to tailor the charge to the facts of the case. (not raised below)
>
> III. The [j]udge failed to instruct the jury on the issue of consent. (raised below)

Because the outcome of this appeal rests on Point II, we address that argument first, considering all applicable law.

A-1434-23

Although defendant did not object to this aspect of the charge at trial, "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981) (citing Gabriel v. Auf Der Heide-Aragona, Inc., 14 N.J. Super. 558, 563-64 (App. Div. 1951)). The trial court has an "independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004) (citing State v. Thompson, 59 N.J. 396, 411 (1971)); see also State v. Fair, 45 N.J. 77, 93 (1965) (finding that "in the factual context of th[e] case that the trial court's failure to charge the jury on [a specific] issue [s]ua sponte was nothing less than plain error requiring reversal").

Accordingly, although the plain error standard of Rule 2:10-2 applies to our review of the charge, we must assure that a defect in the charge was not consequential to the outcome. Indeed, "[e]rroneous jury instructions on matters material to a jury's deliberations are ordinarily presumed to be reversible error." State v. Jackmon, 305 N.J. Super. 274, 277-78 (App. Div. 1997) (citation omitted). Where a jury charge was "inadequate to guide the jury in the course its deliberation should take," the conviction is to be reversed. Id. at 290. Particularly, when "the problem is an incomplete instruction rather than an

12

affirmative misstatement of the law," this court must consider "[t]he strength of the evidence against a defendant." State v. Marrero, 148 N.J. 469, 496-97 (1997). An inadequate instruction coupled with underwhelming evidence of defendant's guilt is "clearly capable of producing an unjust result" and warrants reversal on plain error grounds. See ibid.

While "[n]o party is entitled to have the jury charged in his or her own words," State v. Jordan, 147 N.J. 409, 422 (1997), a trial judge may be required in certain situations to mold or tailor the model jury charge "in a manner that explains the law to the jury in the context of the material facts of the case." State v. Concepcion, 111 N.J. 373, 379 (1988). "That requirement has been imposed in various contexts in which the statement of relevant law, when divorced from the facts, was potentially confusing or misleading to the jury." State v. Robinson, 165 N.J. 32, 42 (2000). In such instances, "the trial court was required to explain an abstract issue of law in view of the facts of the case." Id. at 43.

In its decision denying defendant's JNOV application, the trial court recognized the challenges posed by the parties' idiosyncratic relationship, observing "[w]hat makes the court's analysis here somewhat more difficult is that both [C.H.] and Mr. Murray testified that they engage in 'rough sex.'" The

same is true of the jury charge.  It was precisely the parties' particular sexual relationship, conflicting signals, and admitted misunderstandings that made the need for a tailored charge essential.

The need for a tailored charge became even more apparent when the jury requested readback concerning C.H.'s reaction to anal sex on November 1.  However, the readback did not entail the full testimony that should have been presented on the subject count.  The full circumstances should have been assembled and recited so that the jury could fairly determine whether C.H. consented and whether defendant reasonably believed she had done so.  Again, pursuant to the model charge, to be considered was whether the "act of sexual penetration occurred without the victim's permission . . . based on evidence of conduct or words in light of the surrounding circumstances, and must demonstrate beyond a reasonable doubt that a reasonable person would not have believed that there was affirmative and freely given permission."  The jury was also to consider "[i]f there [wa]s evidence to suggest that the defendant reasonably believed that such permission had been given, [and whether] the State [had] demonstrate[d] beyond a reasonable doubt either that the defendant did not actually believe that such permission had been freely given, or that such a belief was unreasonable under all of the circumstances."  (Emphases added).

14

Among the circumstances the trial court can and should have included in its tailored charge were the parties' testimony as to the one (according to C.H.) or two (according to defendant) times prior to November 1 that the parties engaged in anal sex and C.H.'s reactions to it. Those reactions included C.H. claiming that she welcomed anal sex and that she simultaneously disliked and enjoyed anal sex.

Text messages between the parties highlight that C.H. welcomed defendant's sexual advances pertaining to anal sex. Before their first anal experience, the parties exchanged the following texts: Defendant: "You put the dolla dolla bills emoji. And I'd still love you. As long as I got some lovin['] and some toys." C.H.: "Oh is that all you want?" Defendant: "Well I'm sure I'll think of other things but we can work out the details later." C.H.: "Lol." Defendant: "Only if princess wants that though." C.H.: "What's in it for me?" Defendant: "Anal [or] whatever princess wants." C.H.: "You had me at anal." Defendant: "I've actually never done it." After their encounter on October 6, 2019, defendant inquired as to whether C.H. enjoyed anal sex: Defendant: "I had fun." C.H.: "I have cum in my ass. I'd definitely say you had a good night." Defendant: "Did you?" C.H.: "Absolutely. I love you very much."

A-1434-23

The jury charge also should have recited or summarized C.H.'s testimony about defendant's contact with her the day after the November 1 encounter, where C.H. admitted that she may have contributed to defendant's reasonable belief that anal sex was permissible.

> A: I was in the bath that morning, as I said, and he sent me a text message around 9:45 in the morning. And he said, it's chilly outside. And I said, I didn't realize you control the weather. He said[,] I'm not saying sorry for that. I'm sorry for hurting you and for <u>misunderstanding</u>. And in that moment, I felt so lost in that text because he had not said a word to me. He hadn't – I mean, nothing after he had assaulted me that morning. So why now all of the sudden? How do you know it's a misunderstanding?
>
>    . . . .
>
> He was very apologetic, and he just kept saying it was a <u>misunderstanding</u> and he called me on the phone, and we talked. And he just made me feel like it was something I did. <u>It was – I should have said more. I should have expressed that I didn't want it more.</u>
>
>    . . . .
>
> Q: Why did you still allow him to stay with you?
>
> A: I believed that he was sorry, and I felt like it was something I did. Like, everything that he was saying to me made me feel like there was a <u>misunderstanding</u>.
>
> [(Emphases added.)]

A-1434-23

Finally, the jury charge should have incorporated C.H.'s testimony that she ended their relationship as a result of defendant's alleged infidelity, as that bore directly on the issue of her credibility in determining consent. In particular, C.H. testified that:

> During both instances, there were certain things that he was doing, certain patterns that I would notice with him . . . . And it was always surrounding when he was actively seeing other women . . . . I just knew in that moment that's what it was that day. And I just needed to understand. I needed to understand how he could do that to me again. . . . this was a pattern at this point. So I grabbed his phone, and I went up to the bathroom. I had to see it for myself. I had to see it. . . . There was a lot there confirming exactly what I knew.
>
> [(Emphasis added.)]

In sum, recitation or summary of the conflicting proofs regarding all of the surrounding circumstances concerning the parties' relationship, particularly their anal sex experience of November 1, was essential for a fair trial. Failure to tailor a charge on that subject was plain error, requiring reversal of defendant's conviction.

If the case is retried, the trial court must "tailor the charge to the facts of the case to prevent juror confusion." State v. Randolph, 228 N.J. 566, 593 (2017) (quoting State v. Randolph, 441 N.J. Super. 533, 563-64 (App. Div. 2015)).

In view of our holding, the State's cross-appeal of the trial court's sentence in the third-degree range is rendered moot. We do not rest our conclusion on or adopt defendant's arguments for a JNOV, although the trial court should have performed a more robust review of the JNOV application. Accordingly, the trial court shall convene a conference within twenty days to address the remand with counsel.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1434-23